[Crim. No. 1794. In Bank.—July 6, 1914.]

THE PEOPLE, Respondent, v. FERNANDO MAMMILATO, Appellant.

CRIMINAL LAW—HOMICIDE—SUFFICIENCY OF EVIDENCE TO SUSTAIN VERDICT OF GUILTY.—In this prosecution for homicide the jury was warranted, under the evidence, in determining that the defendant, incensed and angered by the vile epithets addressed to him by the deceased, and smarting under the repeated accusations against his honesty, left the place where the statements were made, went to his room and procured the dagger with which the crime was committed, with the intention of attacking the deceased; and that, having procured the weapon, he returned to the vicinity of the homicide, waited until the deceased appeared, and then stabbed him to death.

ID.—MURDER IN FIRST DEGREE—INTENT AND PREMEDITATION.—A homicide committed under such circumstances and with such intent constitutes murder of the first degree; and as the evidence here is sufficient to support such a verdict, this court cannot disturb it on appeal.

ID.—INTERPRETER FOR WITNESS—WHEN PROPERLY REFUSED.—It was not error in such a prosecution to refuse to permit the defendant, an Italian who was about twenty-five years of age and who had lived in Canada and the United States for some six years, to give his testimony through an interpreter, in the absence of anything in the record, covering a long direct and cross-examination, disclosing that he did not readily understand the questions asked him or have any difficulty in narrating all that occurred between himself and the deceased according to his account of it.

ID.—CROSS-EXAMINATION OF DEFENDANT—MATTERS PROPER TO BRING OUT.—It was proper in such case to permit the prosecution to cross-examine the defendant on the matter of opening his pocket knife in the card room of the saloon where the deceased reviled him, and rushing toward the barroom where the deceased was, notwithstanding the defendant gave no testimony on such subject on his direct examination, though he did undertake to testify to all that occurred in the saloon from the time he and the deceased met there until he left.

ID.—SCOPE OF CROSS-EXAMINATION—CATEGORICAL REVIEW OF TESTIMONY IN CHIEF.—While ordinarily the cross-examination of the defendant must be confined to matters testified to in chief, this does not mean that the examination must be confined to a mere categorical review of matters testified to on direct examination.

ID.—DYING DECLARATION—LACK OF REALIZATION OF IMPENDING DEATH—SUBSEQUENT RATIFICATION.—A declaration made by a wounded person at a time when he was not impressed with the sense of impending death, but thereafter reaffirmed by him at a time when he was impressed with the fact that all hope of living is gone, is admissible in evidence.

APPEAL from a judgment of the Superior Court of Alameda County and from an order refusing a new trial. William S. Wells, Judge.

The facts are stated in the opinion of the court.

George F. Cosby, Lawrence Sledge, and Geo. Ingraham, for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

LORIGAN, J.—Defendant was convicted of murder of the first degree, sentenced to death, and from the judgment and order denying him a new trial appeals.

Defendant was a laborer employed in and about Sunol, Alameda County, when this tragedy took place, and lived at a rooming and boarding house occupied by a Mrs. Andrews. The deceased—John Smith—was a storekeeper at Sunol. Some days prior to November 9, 1912, the day when the stabbing occurred which caused the death of deceased, the defendant came into the store of deceased while the latter was engaged in counting into piles a large amount of money, and, unobserved by deceased, took from one of the piles a twenty dollar piece which he placed in his pocket and went out of the store. Shortly thereafter deceased missed the money and about the same time that he did so defendant returned to the store. Deceased charged him with stealing the money and threatened him with arrest and prosecution if it was not immediately returned. Defendant repeatedly denied taking it while deceased persisted in his accusations and threats. Defendant went out of the store but returned immediately and laid the twenty dollar piece on the counter, saying that he had only taken it for fun or as a joke, and departed. Deceased and defendant next met on the evening of November 9, 1912, in the Hazel Glen saloon in Sunol. The deceased came in about 7:30 and was at the bar when defendant and a party with whom he had been playing cards in a back room came out to the bar for drinks. Defendant accosted the deceased, asking him to play a game of cards with him, which deceased emphatically declined to do, accompanying his declaration with vile epithets directed to defendant in the course of which he accused him of stealing twenty dollars from him; charged him with being a thief; that he belonged in San Quentin and that he intended to put him there. Defendant made no response in kind to the low epithets of deceased though naturally becoming angered by them, but protested that the taking of the money by him was all in jest and warned the deceased to look out about making such accusations against him. This altercation was quieted by other parties at the bar and defendant immediately retired to the card room where another game had started. He did not participate in it but seated himself near the players. He was angry and muttering to himself in Italian. He was seated but a few minutes when deceased, who had remained at the bar talking to the barkeeper, again referred to defendant and in a loud tone of voice and with a vile epithet declared that he would fix him.

Defendant immediately that this last remark of deceased was made took out a pocket knife and opening its large blade made a rush for the barroom but one of the players in the room who had been watching him caught him as he passed, took the knife from him, brought him back into the card room and gave the knife to the barkeeper. Defendant remained in the card room but a few minutes and then left the saloon by the back way. The theory of the prosecution is that the defendant left the saloon at this time to secure a dagger which he had in his room at the boarding house for the purpose of killing the deceased. After leaving the saloon he was seen going rapidly in the direction of his rooming place at Mrs. Andrews. The evidence shows that in a washstand drawer in his room there the defendant had a dagger with a blade four or five inches long. This was seen in the drawer Friday night—the deceased was stabbed on Saturday night. Search was made for this dagger in the room of the defendant the Monday following but it could not be found, and, in fact, has never been seen since. After the departure of the defendant from the saloon of which it does not appear deceased had any knowledge, the latter remained about twenty minutes and left. Within a very short interval afterward he was brought into a barber shop adjoining the saloon, having been stabbed with a weapon in the hand of defendant. There were no witnesses as to what took place between the defendant and deceased when they met outside the saloon and the latter received his death wound. The meeting occurred on the street in the vicinity of the Southern Pacific railroad depot. A witness approaching in the direction where defendant and deceased met testified that he could see indistinctly through the darkness —the night was dark and drizzly—two men together as though they were fighting, and immediately one turned and ran away passing by the witness who then recognized him as the defendant. He could not recognize who they were when they met each other. In fact, as to what then actually occurred there is but the testimony of the defendant and the dying declaration of the deceased. In his dying declaration the deceased stated that the defendant stabbed him near the Southern Pacific depot about twenty minutes to eight o'clock without a word except "Hello, Smith"; that he then stabbed him and ran away. The testimony of the defendant is that after leaving the Hazel Glen saloon he had gone to the saloon

of a countryman of his to see a friend and not finding him was on his way back to the Hazel Glen saloon when he met deceased who had just come out of it; that when they met deceased immediately commenced to again revile him with low epithets and struck him twice in the face; that defendant started to run away, but deceased pursued him along the street; that at the time deceased struck him in the face in putting up his hand to protect himself he felt a knife in the inside pocket of his coat and as he ran he drew it out; that deceased overtook him and again struck him in the face; that he warned deceased that he had a knife but nevertheless deceased rushed upon him and grabbed him by the neck with both hands; that as deceased rushed in on him the defendant held the knife in front of him to defend himself and deceased rushed upon it and was wounded; that he did not force the knife into him but only held it out in defense; that deceased then released his hold on him and defendant ran away leaving deceased standing there; that he ran away because he believed that deceased intended to shoot him as he had placed his hand in his hind pocket, at the same time declaring that he would kill defendant. Defendant walked that night to Niles, a town some distance from Sunol, and was arrested the next morning. He testified that as he ran away he put the knife in his pocket again but had lost it while running. The morning of his arrest he told the officers practically the same story as he testified to on the trial. When arrested he complained that his face was sore and swollen from the blows inflicted by deceased upon it but witnesses who examined his face at the time he made the statements observed no swelling or any abrasion or discoloration upon it.

The weapon with which deceased was wounded was the dagger that was usually kept in the room of the defendant. It belonged to Mrs. Andrews although defendant kept it in his room. He testified that he had put it in his pocket—sheathed in its wooden case—the morning of the day of the stabbing to use it in gathering mushrooms, but was prevented from going out for that purpose and had forgotten to put it back in his room; that he had forgotten that he had it at all times thereafter even while in the Hazel Glen saloon until when putting up his hands to protect himself from the blows of de-' ceased he had felt it in his inner coat pocket and drew it out. The deceased lived about four hours after being wounded. The

autopsy showed that the dagger penetrated the body of deceased the full length of the blade; that the seventh rib was cut nearly three-fourths through and the weapon penetrated into the heart of deceased some two inches. Neither the deceased nor the defendant were intoxicated that evening.

Appellant makes the point that the evidence was insufficient to sustain the verdict against him. His counsel make this claim without any discussion of it at all, simply submitting "all the testimony taken on the trial" for the consideration of the court. Discussing this point as briefly as appellant presents it, it is only necessary to say that under the evidence, the salient portions of which we have stated, the jury was warranted in determining that incensed and angered by the vile epithets addressed to him by the deceased and smarting under the repeated accusations against his honesty, the defendant left the saloon, went to his room and procured the dagger with which the killing was done with the premeditated intent and purpose of assailing the deceased; that having procured it he returned to the vicinity of the saloon, waited until deceased came out of it and without warning stabbed him to death. A homicide committed under such circumstances and with such intent constitutes murder of the first degree, and as the evidence here was sufficient to support such a verdict we cannot disturb it.

It is next insisted that the court erred in not permitting the defendant to give his testimony through an interpreter. The defendant is an Italian and at the time of the trial was about twenty-five years of age. He had lived in Canada and the United States about six years. The court was of the opinion that the defendant understood English sufficiently well to testify without an interpreter although one was sworn and instructed to follow the defendant, and if it appeared he did not fully understand the questions asked to aid him. The testimony of defendant appearing in the record covering a long direct and cross-examination does not disclose that any error was committed by the court in denying him an interpreter. He had a very good command of English and the record does not disclose that he did not readily understand the questions asked him or have any difficulty in narrating all that occurred between himself and deceased according to his account of it. From the beginning to the end of his narrative his counsel according to the record before us do not seem to have consid-

ered that at any point in it he so failed to understand questions asked or to give a direct and intelligent answer to them that the use of an interpreter was required save in a couple of instances when he did not understand the meaning of a few words, and then the interpreter was used. From an examination of the record and of his testimony as given by question and answer we do not perceive that any prejudice at all followed from refusing the defendant the aid of an interpreter.

It is next insisted that the court erred in allowing the prosecution to cross-examine the defendant on the subject of his opening his pocket knife in the card room and rushing toward the barroom where decedent was, which we have referred to in our statement of the evidence. This matter had been detailed by a witness for the prosecution without any objections on the part of the defendant, and properly so, as tending to show the state of mind of the defendant toward deceased growing out of his revilement of defendant. It is not now insisted that such evidence would not be relevant but it is claimed that as on his direct examination nothing was testified to by defendant as to his actions when he returned from the bar to the card room it was improper to permit the prosecution on cross-examination to go into that matter. While the rule is that the cross-examination of a defendant must be confined to matters testified to in chief, this does not mean that such examination must be confined to a mere categorical review of matters testified to by him on direct examination. In his testimony in chief defendant undertook to testify to all that occurred in the saloon from the time he and deceased met there until defendant left; the conduct and actions of the deceased and his own conduct and actions there, and testified that he left the barroom when the revilement of him by deceased had ceased and went into the card room and from there immediately left the saloon by the back door when he heard the deceased in a loud voice declare to the barkeeper that he intended to fix him; that he then left because he was afraid of deceased. The defendant having undertaken to testify to all that occurred in the saloon from his meeting with deceased there until his departure therefrom, could not preclude the prosecution on cross-examination from inquiring as to matters pertinent to the case which it claimed defendant had omitted to testify to while assuming to state all that occurred between these two intervals of time. It could cross-examine him for

the purpose of bringing out in detail anything bearing on the case that occurred during that period as to the conduct and actions of defendant respecting which he had testified about only in a general way, and to that end direct his attention to a precise matter and inquire whether it did not occur. (*People* v. *Russell*, 46 Cal. 121.) In this view it was proper for the prosecution to make inquiry of defendant whether as part of what transpired in the card room he had not then taken out a knife and made an effort to return to the barroom where deceased was.

It is next insisted that the court erred in admitting in evidence the dying declaration of deceased. The claim is that it was not made by deceased under a sense of impending death. The deceased after he was stabbed was taken first to a barber shop in the vicinity and from thence to his residence. E. E. Ritter, a local attorney and notary public, was sent for and arrived at the residence of deceased about 10 o'clock and being informed by the attending physician that the deceased wanted to make a statement, Ritter asked him if he wished to do so. Deceased said he did. Ritter said to him: "Now, if you make a statement it is necessary for you to realize that you are going to die; it is important that you realize for certain that you are going to die to make this." Then deceased answered as to his dying: "Well, I don't know; I think I will pull through; I want to state how this thing happened." He then made a statement which Ritter reduced to writing, read over to him and which the deceased signed. This statement was: "I realize that I am about to die, and wish to make a statement. Fred stabbed me near Southern Pacific depot about twenty minutes of 8 o'clock P. M., without a word except 'Hello, Smith,' and then stabbed me, and then ran away from me. I had an argument with him over the stealing of twenty dollars on election day. He gave the twenty dollars back after I had a row with him, fifteen or twenty minutes after, and said he was only fooling. Frank Mendonca seen me have the argument with him." Signed "John Smith." "Subscribed and sworn to before me this 9th day of November, 1912. Edward M. Ritter, Notary Public in and for the County of Alameda, State of California."

Ritter then left the residence of deceased to go to his office to prepare a deed which deceased desired to execute. He retained the written statement made by deceased. He returned

in about an hour—in fact was sent for and informed that the deceased was dying. He testified that when he reached deceased he asked: "Now, John, do you realize that you are going to die?" And he says, "Yes," he says, "I know I haven't got a chance."

"The Court: He says what?

"A. He says, 'I know I haven't got a chance.' Well, I says, 'do you want to acknowledge this statement now as your dying statement that you made a while ago?' and I read it over to him. I read this statement that I had written out and he had signed; I read it over to him, and he said 'Yes, I acknowledge that as my dying statement.' I marked the time here as 11:10. I think he died at 12:05."

While the Christian name of defendant is Fernando, the evidence shows that he was known about Sunol as Fred. In fact, there is no question but that the person referred to in the statement of deceased as Fred was the defendant.

While it appears that the statement received by the court as his dying declaration when originally made by deceased was not made under a sense of impending dissolution, his subsequent ratification of it at a time when it appeared that hope of living was gone, was sufficient to entitle it to admission by the court. It was not necessary at the time when deceased was conscious that he could not live that he should make another statement independent of the one already made. If, while in the possession of his reasoning faculties and under a sense of impending death a declarant reaffirms as true a statement of facts previously made and produced and reread to him, as the evidence shows was the case here, that is sufficient to entitle it to be admitted in evidence as a dying declaration. (*People* v. *Crews,* 102 Cal. 174, [36 Pac. 367].)

We have considered and disposed of all points presented on this appeal for a reversal and as all of them are untenable the judgment and order appealed from are affirmed.

Melvin, J., Henshaw, J., Sloss, J., Shaw, J., and Angellotti, J., concurred.