[Crim. No. 3826. In Bank.—May 27, 1935.]

THE PEOPLE, Respondent, v. NELLIE MAY MADI-
SON, Appellant.

Joseph W. Ryan and Frank J. Ryan for Appellant.

U. S. Webb, Attorney-General, Eugene M. Elson, Deputy Attorney-General, Buron Fitts, District Attorney, and Tracy Chatfield Becker, Deputy District Attorney, for Respondent.

SHENK, J.—The defendant was convicted of murder of her husband, Eric D. Madison. The jury returned a verdict of first degree murder without recommendation. The court imposed the death penalty in accordance with law. From the judgment of conviction, and from an order denying her motion for a new trial, the defendant appeals.

About 4 o'clock on Sunday afternoon, March 25, 1934, a body identified as that of Eric D. Madison was found in the room occupied by the couple in an apartment house in the city of Burbank in Los Angeles County. The evidence also showed that four out of six bullets fired from a 32–20 Colt revolver pierced the body. The shots were shown to have been fired at close range. One of them pierced the head, coming out at the corner of the left eye near the nose. Another entered the back and passed through the great aorta into the liver. Some pierced the mattress and bedding and lodged in the floor beneath the bed. Others lodged in the wall. The body of the deceased was found clad only in underwear, lying partly on the floor with the left arm over a chair. There were large blood stains on the bed linen, and the underclothing on the deceased was blood stained. The evidence satisfactorily established that the body had been dead more than twelve hours.

On the previous Friday, March 23d, about noontime, the defendant had purchased a 32–20 calibre Spanish revolver from a second-hand dealer. At the time she made this

purchase she stated that she and her husband were going on a trip and wanted a gun. She was shown a 25 Colt automatic which she rejected, stating she "was not used to automatics". She signed an application for the Spanish gun, paid a deposit and returned for the gun the next day a little before noon. She received the gun and a few shells, the remains of a broken package. About noontime Saturday she took the Spanish gun to a hardware store and asked for some shells that could be fired from it. She was told that the gun would have to be repaired before it could be fired. She thereupon purchased a 32–20 calibre Colt revolver and shells. She did not have sufficient money with her to pay the bill of $31 and said she would have to get more money from her husband. About three-quarters of an hour later she returned with the money. She then explained that she and her husband wanted the gun for target practice on a week-end trip to Frazier Mountain Park and did not want to wait the required 24-hour period before she could have possession of the gun. At the store she called up the police department and asked for two persons by name, who were not available. She then went to the upstairs telephone and when she came down she reported that "Lew" had authorized her to take the gun. She left the shells for the Spanish gun at this store and departed with both guns, and shells for the Colt revolver, in her possession.

At 8 o'clock on Saturday evening the defendant sat in the lobby of the apartment house where she and her husband resided. The caretaker testified that he had a conversation with her in which he asked where her husband was. She replied in substance that he was out and might be home at 10, or 12, or 1, or 2, or not at all. That he said in a manner of "kidding", "What, another woman?" to which she replied, "Yes, another woman". About ten minutes past ten her husband came into the lobby, spoke to the caretaker, and then passed into their apartment without speaking to his wife. She followed him into the apartment. The record indicates that that was the last time Eric D. Madison was seen alive.

That night about fifteen minutes to 12 loud, sharp noises or "cracks" which sounded like pistol shots were heard by several of the other residents of the apartment house. Several people gathered in the hall in the vicinity of the Madi-

son apartment looking for the source of the sounds. Some testified that they heard five shots with an interval of a few seconds before the last four, and others testified that there were six shots, with such an interval. It was in evidence that in this interval an agonizing scream was heard. The occupant of the apartment adjoining the Madisons' apartment testified that the sounds seemed to originate right outside her door, and that besides the scream she also heard some moans or groans at the termination of the succession of "cracks" or shots. The jury could believe from the evidence that the vocal sounds referred to were made by a man's voice. Others testified that the shooting was "right down the hall", meaning in the direction of the Madison apartment. The manager commenced a check-up of the apartments. She knocked on Mrs. Madison's door and asked if she had heard the shooting and whether she was all right, to which Mrs. Madison answered in the affirmative. Mrs. Madison then came out of the room into the hall and pulled the door shut behind her. She said the noise was down underneath her. She joined the others in the hall. She also made the statement that "perhaps it was from an automobile passing; that just last week an automobile had gone by with a girl screaming for help; that it was a weird place to live in and most anything was liable to happen". The defendant appeared calm and serene. She was asked if she was afraid and answered "No," and that her husband would be home in about ten minutes.

The Warner Brothers studio was situated in the neighborhood about 500 to 1,000 feet distant from the apartment house. The deceased had been employed in the coffee shop of the studio, from which he usually returned home about 6 o'clock. The defendant was occasionally employed at the studio. That Saturday night the studio was engaged in taking a gun shooting scene in a certain film and the shooting of guns was noticeable about 1,000 feet away. Work had continued on that picture that night until about midnight. It was also in evidence that animals and fowl were kept on the studio premises; that peacocks sometimes gave shrill cries or screams; that such sounds were often heard from the studio and that frequently the neighborhood did not settle into quiet until past midnight, but that the witnesses were not disturbed by the sounds coming from the studio.

The fears of those who had gathered in the hall of the apartment house on the night of March 24th were finally allayed by the suggestion of one of the men that the noises perhaps emanated from the Warner studio.

Mrs. Madison was seen leaving her apartment at half-past 8 the next morning dressed for the street, and carrying a paper wrapped parcel. About the same time and later during the day there was seen hanging on the door of her apartment a sign which read, "Please do not disturb. I will get my laundry later." No one else was seen to leave or enter the Madison apartment until about a quarter to 4 that Sunday afternoon. At that time two persons carrying a suitcase called on the manager of the apartment house and stated that Mrs. Madison had arranged to reserve an apartment for one of them. The manager had not so been informed and they proceeded to Mrs. Madison's room. The "please do not disturb" sign was on the door. The manager received no response to her knock and opened the door with her passkey. The body of Eric D. Madison was discovered in the condition hereinbefore described.

About midafternoon of the following day three officers arrived at the Cuddy ranch, eleven miles west of the Ridge Route highway in Kern County. They found the defendant sitting on a suitcase behind the clothes in a clothes closet off the bedroom, with a coat placed over her knees. The officers testified that Cuddy, who had been drinking during the week-end, said: "Nellie, why didn't you tell me it was murder?" The defendant had arrived at the Cuddy ranch on Sunday alone. Cuddy testified that on Monday afternoon he and the defendant were sitting in the living room and he asked her what was the matter, to which she replied that she had had "a little trouble" with her husband and expected the officers to come after her; that about twenty minutes later when the officers appeared in the driveway she said, "Here they come now." When she was found in the clothes closet she explained that she had been changing her shoes.

The sales slips for the guns purchased by the defendant were found in her purse and the Spanish gun and some cartridge shells, wrapped in brown wrapping paper, were found in her car. The Colt revolver purchased by her was never found.

The defendant testified. She explained that she had purchased the guns at her husband's suggestion because he had been threatened and because they wanted to use them on a trip to Arrowhead or the Cuddy ranch; that on Saturday night when he came in he did not take off his clothes but prepared to leave again to see a man from Bakersfield about a job, and that if he did not come back that night she should meet him on Sunday at the Cuddy ranch where he would stop on his way from Bakersfield; that she had given him the two guns in a package on Saturday afternoon when then were out driving and he had put them in a pocket of the car; that she could not identify photographs introduced in evidence depicting the body found in her apartment, and that she believed Eric D. Madison was still alive.

Only the salient facts and some of the testimony in support of the jury's verdict have been stated. Those facts and testimony require an affirmance of the judgment unless the record shows that claimed erroneous rulings of the court, if error, have resulted in a miscarriage of justice.

■ The defendant contends that the court erred in giving an instruction on the subject of the accused's flight from the scene of the crime. There was sufficient in the testimony which, if believed by the jury, constituted a foundation for the giving of an instruction conformably to the provisions of section 1127c of the Penal Code. The trial court gave such an instruction, which was the only instruction permitted by the section.

■ The defendant relies on *State* v. *Moxley,* 102 Mo. 374 [14 S. W. 969, 15 S. W. 556], to support her contention that the court should have given a requested instruction that the defendant was entitled, in addition to the ordinary presumption of innocence, to the equally favorable presumption, arising from the marital relation, that a wife loves her husband. The court was not in error in refusing to give the requested instruction. The jury was fully instructed on the subjects of the presumption of innocence and reasonable doubt, which were all the instructions on presumptions to which the defendant was entitled. (Pen. Code, sec. 1096.)

■ ■This also answers the contention that the court, in addition to the instruction provided by said section 1096, should specifically have instructed the jury that the presumption of innocence attaches to every stage of the case and to every

fact essential to a conviction, and that it is a presumption that abides with the defendant throughout the trial of the case. The defendant concedes that the instruction provided in section 1096 of the Penal Code was read to the jury. This was all the defendant was entitled to on the subject. (Sec. 1096a, Pen. Code; *People* v. *Williams,* 96 Cal. App. 215 [273 Pac. 1087].)

 The court did not err in refusing to instruct the jury that it required twelve of their number to agree on a verdict whether of the offense charged "or of a lesser degree". The jury was otherwise properly instructed on the matter. There was no evidence offered upon which the jury, if it believed the defendant committed the homicide, could base a verdict of guilty of a lesser crime than murder of the first degree. In this case the defendant cast her all on the chance of obtaining a verdict of acquittal.

 Pursuant to section 1105 of the Penal Code the court gave the following instruction: "The court instructs the jury that up to the moment when the killing is proved, the prosecution must make out its case beyond a reasonable doubt. When the killing is proved, its devolves upon the defendant to show any circumstances in mitigation to excuse or justify the homicide by evidence on his part; that is, the killing being proved, the defendant must make out his case in mitigation, or to excuse or justify it by some proof strong enough to create in the minds of the jury a reasonable doubt of his guilt of the offense charged, unless, as before stated, the proof on the part of the prosecution tends to show the crime committed only amounts to manslaughter, or that the defendant was justified or excused in doing the act." The defendant cites *People* v. *Post,* 208 Cal. 433 [281 Pac. 618], in support of her contention that the giving of that instruction constituted reversible error. In that case an instruction pursuant to the same section was given which told the jury that when the killing is proved, it devolves upon the defendant to show any circumstances in mitigation to excuse or justify "by a preponderance of the evidence on his part". That is, the killing being proved, "the defendant must make out his case in mitigation to excuse or justify by some proof stronger in some appreciable degree than the proof of the prosecution. The burden of proof changes. It must be in some degree, no matter how small,

stronger than the proof of the prosecution on the other side.'' The giving of the quoted portion of the instruction was held reversible error in that case. There can be no similar criticism of the instruction given in the present case. The latter instruction in fact conforms to the precepts expounded in the case relied upon. The only similarity between the instructions is the omission in each of the words of section 1105 of the Penal Code that the commission of the homicide ''by the defendant'', being proved, etc. It was not held in the cited case that the failure to include those words constituted prejudicial error. In fact, the contrary was indicated. While we disapprove the failure to include in the instruction the full language of section 1105 in that respect, we nevertheless conclude that in the light of other instructions given the jury was not misled.

■ The defendant was entitled to the special instruction requested to the effect that circumstantial evidence must produce a reasonable and moral certainty that the accused, ''and that no other person'', committed the offense charged. The court gave the instruction on the subject of circumstantial evidence which was criticised as deficient in the same respect, i. e., by the omission of the words in quotation marks, in the case of *People* v. *McClain,* 115 Cal. App. 505 [1 Pac. (2d) 1085]. The failure to give the quoted portion of the requested instruction is defended by the statement that the case does not rest entirely on circumstantial evidence. But what evidence is considered direct evidence of the slaying by the defendant is not pointed out. However, an examination of the entire record points unerringly to the conclusion that, had the requested instruction been given, the jury would not have arrived at any different conclusion.

■ The further criticism of the given instruction that it contained matter which could be construed as comment upon the facts in evidence is without merit. The matter complained of was merely definitive in character to illustrate the distinction between direct and circumstantial evidence.

■ There was no error in the criticised instruction given on the subject of motive. The defendant claims that an instruction that proof of motive was nothing more than a circumstance to be considered by the jury, is erroneous, because evidence of want of motive has an affirmative character favorable to the defendant. In the same instruction the

court stated that absence of proof of motive is equally a circumstance in favor of the accused.

The defendant attacks several rulings of the court in the introduction of evidence and examination of the witnesses. The court, over the objection of the defendant, permitted the prosecution to attempt to impeach the defendant's testimony as to her knowledge and use of firearms, by examination as to a circumstance designed to show that the defendant had previously possessed firearms and had before witnesses shot at a former husband. The court also permitted the prosecution to introduce prior contradictory statements of fact in that regard contained in a verified complaint for divorce filed by the former husband, who was called by the prosecution to give the impeaching testimony. It is contended that the claimed purpose of impeachment of the defendant's testimony by contradictory evidence was ostensible only and that in fact the prosecution sought to impeach the defendant by inadmissible evidence of particular wrongful acts. (Code Civ. Proc., sec. 2051.) The question of the purpose of the testimony was before the trial court and while the contention of the defendant might be considered arguable, nevertheless as the testimony tended to contradict the defendant's testimony in the respect noted, we cannot say that the court erred in admitting the evidence for that purpose. Nor can we say that the court erred in permitting the state to show the prior sworn contradictory statements of its own impeaching witness when it expected the witness to testify in accordance with the statement of facts contained in his verified complaint. In any event, inasmuch as the same evidence was elicited by independent testimony, the introduction of the prior sworn statements, if erroneously admitted for the purpose of permitting the state to impeach its own impeaching witness, was without prejudice.

Other contentions that prejudicial error was committed in the rulings of the court on the admission of evidence to impeach the defendant's testimony have been examined and are found to be without merit.

The defendant claims further that error was committed by the trial judge's testifying in the case as a witness for the prosecution. The judge's testimony related to the time which elapsed between taps made by a witness

to indicate the interval of time between the two groups of shots heard by her on the night of March 24th. The interval did not appear in the record and the trial judge had timed it. The trial judge was a competent witness to testify what that interval was. (Sec. 1883, Code Civ. Proc.) Nor is there any merit in the contention that the trial court exceeded its proper function in taking a part in the examination of some of the witnesses.

■ Various specifications are made of claimed prejudicial error in permitting certain witnesses, including the ballistic expert and a mortician, to testify to certain facts. An examination of these claims indicates clearly that they are without substantial foundation.

■ Although we cannot give sanction to the practice of exhibiting unnecessarily to the jury gory physical evidences of the crime which are calculated or likely to inflame the jury's deliberations, nevertheless we cannot say that the exhibition during the trial of the bed and bedding from the Madison apartment necessarily was beyond propriety or had that effect. ■ The questions whether the exhibit should remain and was needed to substantiate and illustrate the expert and other testimony as to the shots fired and whether it would tend to inflame the jury to the prejudice of the defendant, were questions addressed in the first instance to the discretion of the trial court, and no abuse of the exercise of that discretion is shown. There is no basis for the contention that the verdict of the jury was the product of any inflammation or prejudice caused by this exhibit.

■ Nor can we discover any error in the court's permitting the removal of retouching evidences on a photograph of the deceased taken in his lifetime, and the restoration of the negative as far as possible to its original condition. There was no evidence that any altering of the negative took place other than the elimination of removable substances used in the retouching by the person who originally made the photographs.

■ The contention is made that pursuant to the provisions of subdivision 6 of section 1181 of the Penal Code the trial court should have modified the judgment so as to indicate that the defendant was guilty of murder of a lesser degree. The exercise of the power of the trial court or of this court thus to modify the judgment without granting

or ordering a new trial is dependent upon the presence of some evidence tending to prove that the defendant, if he is guilty of any crime, is guilty of a crime of a lesser degree than the crime of which he was convicted. There is no evidence in the record, nor was any offered, upon which to base the modification requested.

The other specifications of error are lacking in merit. The record discloses that the defendant had a fair and impartial trial, singularly free from anything upon which to predicate a charge of prejudicial error. The evidence is sufficient to support the verdict, and on the record the court is not justified in disturbing the judgment.

The judgment and order are affirmed.

Thompson, J., Waste, C. J., and Curtis, J., concurred.

Rehearing denied.