[Crim. No. 3743. Second Dist., Div. One. Dec. 14, 1943.]

THE PEOPLE, Respondent, v. AMADOR DIAZ, Appellant.

Philip S. Schutz for Appellant.

Robert W. Kenny, Attorney General, and T. G. Negrich, Deputy Attorney General, for Respondent.

WHITE, J.—In an information filed by the District Attorney of Los Angeles County defendant was accused of the crime of murder, to which charge he entered a plea of not guilty. Following a trial the jury returned a verdict finding the defendant guilty of murder in the first degree and

fixed the punishment at life imprisonment. A motion for a new trial was denied, and this appeal is prosecuted by defendant from the judgment of conviction and from the order by which his motion for a new trial was denied.

Briefly, the record discloses that both defendant and the decedent were married men, the fathers respectively of several children, and residing in the same neighborhood. The transcript on appeal discloses no evidence of any feeling of ill-will or animosity between them, and at the trial it was testified that on the day of the homicide they had consumed some refreshments together. On the day decedent met his death the defendant was building a fence upon his premises, starting such work about 10 o'clock and continuing until about 5 p. m., except for about an hour at noon when he ate his lunch. Defendant testified that during the day he and his helper consumed approximately seven quarts of beer. He further testified that when he quit working on the fence and went to feed his livestock about 5 :30 o'clock, he was "about half drunk or drunk." After consuming his supper, at which he did not drink any liquor, he went to the Amapola Cafe, located a few blocks from his home, where he consumed another quart of beer. He returned home and about 8 :30 p. m. went back to the cafe where he consumed two more quarts of beer. According to the defendant, while he was in the cafe at about 10 o'clock there was a quarrel or disturbance outside in connection with which several bottles were hurled and considerable noise made. During the evening and at about the time of the riotous conduct outside the cafe, a man by the name of Acosta was stabbed and taken to the hospital. To an officer defendant stated that he was angered because his friend had been attacked. According to the testimony of the defendant, he then went home, removed the handle from a pick and returned to the cafe where, he explained, that he had taken this action to protect himself against those who throughout the trial were designated and referred to as "pachucos." The record advises us that the word "pachuco" originated in El Paso and was used to describe those who wore peculiar clothing comparable to that worn by "zoot suiters." However, in contradiction of the defendant's testimony that he went home and secured a pick handle, two witnesses who testified they were in front of defendant's home between 10 :30 and 11 o'clock on the night of the homicide, said they saw the defendant come out of his

house with a .22 rifle; that they engaged him in conversation about it and in response to their query as to what he was going to do with it, the defendant replied that he was going to "take the hell out of a pachuco." There is testimony that the defendant proceeded from his home toward the Amapola Cafe. Shortly thereafter one Isadora Garcia and the deceased met at the cafe. They had been friends since 1923 or 1924. Finally they determined that each would go to his respective home. It was drizzling rain on the evening in question. Garcia and the decedent were walking away from the cafe, the latter being about two feet in front of the former. Suddenly, Garcia heard a shot and the decedent dropped to the street and started to moan. When Garcia attempted to assist the decedent he found that the latter had been wounded, whereupon the witness rushed to the cafe and called for help. Another witness testified that he had known the defendant in the neighborhood for five or six years and was also acquainted with the decedent; that shortly after midnight on the date in question the defendant came to the front door of the home of this witness just as the latter was about to retire. The witness went to the door where he accosted the defendant standing there with a rifle, and in the course of a short conversation, during which the defendant "seemed excited," the latter declared "I just killed a pachuco." Another witness testified that while en route to the scene of the shooting in company with a neighbor, the latter, when they encountered the defendant, asked what had happened. At the trial the witness testified "He (defendant) said he had killed a pachuco." At the time this statement was made by the defendant he had a rifle in his hand. Another witness testified that she had retired and upon hearing the shot she, her mother and sister, started for the scene of the shooting; that they passed within three feet of the defendant who was carrying a rifle at that time, and upon being questioned as to what had happened, he replied "Somebody shot Eskil Naranjo." Still another witness testified that about 10:30 p. m., he was in front of defendant's house and saw the latter coming out with a .22 rifle. After the defendant had been arrested and while this witness was standing near him, the defendant cursed the witness for mentioning the rifle. Another witness testified that he knew the defendant and that in January, 1941, had loaned him a .22 rifle, the loan of which the defendant requested to enable

him to kill animals that were molesting his rabbits. Up to the time of the homicide the rifle had not been returned. Deputy sheriffs, who arrested the defendant about 3:15 a. m., on the morning following the shooting, testified that he was not intoxicated, as did another deputy sheriff who interrogated him at about 4 o'clock on the same morning. At the time the defendant was placed in the police car, a son of the decedent was standing alongside when the defendant exclaimed "Naranjo, you son of a bitch, I'm going to get out of this thing and I'll kill you when I get back."

At the trial the defendant testified in his own behalf, during the course of which testimony he denied all knowledge of and connection with the crime. He testified that he was friendly with the deceased, did not see the latter on the night of the homicide and in general denied all of the conversations hereinbefore narrated concerning "pachucos." He also denied that he had a .22 rifle at any time either upon his person or at his home. It might here be noted that a .22 rifle bullet was removed from the body of the deceased. The only other witness for the defense was defendant's wife, who testified that he was home about 11 o'clock on the night in question, was in bed at the time of the killing; that he had been drinking that day and was very drunk when he retired that evening.

For a first ground of appeal it is urged that the evidence is insufficient to sustain defendant's conviction of the crime of murder of the first degree. In this regard it is argued that when viewed in a light most favorable to the prosecution the evidence fails to show beyond a reasonable doubt that the defendant committed the homicide charged against him. This claim cannot be upheld. It is true the evidence was circumstantial, but the law makes no distinction between direct and circumstantial evidence as to the degree of proof required for conviction. All that is required is that evidence of the one kind or the other, or both, establishes guilt beyond a reasonable doubt. We have narrated the evidence more or less in detail because we are satisfied that the inferences and deductions which the jury was entitled to draw therefrom point unerringly to defendant's guilt. His possession of the .22 rifle; his declarations, and in fact, his entire course of conduct on the evening of the homicide, all generate the conclusion that the evidence is sufficient to satisfy both the reason and judgment of one

bound to act conscientiously thereon, that it was the defendant who fired the fatal shot. There is also present the added fact that the defendant was thoroughly impeached as a witness in his own behalf in connection with the matters about which he testified wherein he denied possession of a rifle as well as the declaration of his intention to "take the hell out of a pachuco"; and his admission, following the slaying, that "he had killed a pachuco." Next, we are urged, should we conclude that the evidence is sufficient to connect the defendant with the commission of the crime, to invoke the provisions of subdivision 6, section 1181 of the Penal Code, and modify the judgment of conviction by reducing the same to manslaughter (*People* v. *Kelley,* 208 Cal. 387 [281 P. 609]; *People* v. *Howard,* 211 Cal. 322 [295 P. 333, 71 A.L.R. 1385]; *People* v. *LaFleur,* 42 Cal.App.2d 50 [108 P.2d 99]; *People* v. *Castro,* 37 Cal.App.2d 311 [99 P.2d 374].) This we cannot do in the instant case because the power of the trial court or of this court to thus modify the judgment without granting or ordering a new trial is contingent upon there being in the record some evidence tending to prove that the defendant, if he is guilty of any crime, is guilty of a crime of a lesser degree than the crime of which he stands convicted (*People* v. *Madison,* 3 Cal.2d 668, 679 [46 P.2d 159]). We find in the record before us no such evidence, and indeed, none was offered, for the defendant steadfastly denied any knowledge of or participation in the homicide. The evidence conclusively proves that the slaying was unprovoked, cold-blooded and resulted in the death of an inoffensive man who was quietly wending his way homeward along a public sidewalk.

 Passing from the contention that the testimony is insufficient to support the verdict, appellant alleges prejudicial error in the giving of an instruction on the burden of proof and justification. In response to a request by the prosecution, the court gave as one of its instructions to the jury the following: "Upon the trial for murder, the commission of the homicide by the defendant being proved, the burden of proving circumstances of mitigation or that justify or excuse it, devolves upon the defendant, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter or that the defendant was justifiable or excusable. While the burden of showing the circumstances under which the act is justi-

fied or excused devolves upon the defendant, he is only bound under this rule to produce such evidence as will create in the minds of the jury a reasonable doubt of his guilt of the offense charged." This instruction is predicated on section 1105 of the Penal Code.

The questioned instruction should not have been given because the defendant did not set up any defense by way of excuse for or justification of the alleged slaying, but on the contrary his sole defense was a denial that he committed the homicide. It does not follow, however, that in every case wherein such an instruction, containing as it does, a correct abstract principle, is erroneously given, that a judgment will be reversed. ■ It is elementary that prejudice or injury must be shown to have ensued from the giving of the instruction before a reversal is authorized. Appellant places great reliance upon the case of *People* v. *Tapia,* 131 Cal. 647 [63 P. 1001]. However, in that case the court held that under the circumstances there present it was likely that the jury would infer from the instruction that the commission of the homicide by the defendant had been proved, when the evidence upon that issue was characterized by the trial judge on hearing of the motion for a new trial as "unreliable" and "unsatisfactory," and wherein the Supreme Court said: ". . . we cannot avoid a somewhat strong impression that the defendant had been wrongfully convicted of the high crime of murder in the first degree; and, as in such a case a very slight error of law committed during the trial might have improperly influenced the jury. . . ." No such circumstances prevail in the case at bar. It is also noteworthy that in concluding its decision in the Tapia case the Supreme Court said "In conclusion, we desire to say that this decision is based upon the very peculiar features of this case as above shown; and that in many cases the errors above noticed would not call for a reversal."

Another reason why it does not necessarily follow that because the instruction was inapplicable and therefore erroneous, that a reversal must ensue is that the case of *People* v. *Tapia, supra,* was decided prior to the adoption of section 4½, article VI, of our state Constitution, coupled with the fact that under the holding in *People* v. *Perez,* 19 Cal.App. 2d 472 [65 P.2d 1319] (decided March 9, 1937) and cases therein cited, it would appear that under circumstances such

as confront us in the instant case, the giving of the challenged instruction was not prejudicial.

For the foregoing reasons the judgment and the order denying defendant's motion for a new trial are and each is affirmed.

York, P. J., and Doran, J., concurred.