[Crim. No. 4807.   In Bank.   Dec. 9, 1947.]

THE PEOPLE, Respondent, v. MARVIN JAMES
TUTHILL, Appellant.

R. T. Sullivan, Jr., and Robert Sikes for Appellant.

Paul E. Sloane as Amicus Curiae, on behalf of Appellant.

Fred N. Howser, Attorney General, and Walter L. Bowers, Assistant Attorney General, for Respondent.

SHENK, J.—Defendant was found guilty of the crime of murder of the first degree and sentenced to pay the extreme penalty. His motion for a new trial was denied. His appeal concerns alleged insufficiency of the evidence to support the verdict, alleged misconduct of the district attorney, and alleged errors in rulings on evidence and in charging the jury.

A review of the record reveals evidence which is amply sufficient and which shows the following:

In the year 1945, defendant, a divorced man of 41 years, and Mrs. Charlotte Beverly, a divorcee, commenced living together. In January, 1946, Mrs. Beverly set up a plumbing business for defendant and herself in Cathedral City. She was custodian of the partnership funds and made monthly remittances to defendant's divorced wife in San Diego for the support of his three children. Defendant was addicted to drink, and the business was unsuccessful. In June, 1946, it was discontinued. Mrs. Beverly then left with her daughter for the Yosemite National Park. Defendant drifted from town to town. In November, Mrs. Beverly returned to Cathedral City and she and the defendant resumed their former relations, occupying a cabin of the Sun Haven Auto Court. After six weeks they again separated. On December 21st, defendant moved to the Cathedral City Motel where he registered under an assumed name. Mrs. Beverly remained in the auto court cabin. She told defendant that she planned to join her sister in Boston shortly after Christmas.

A few days before the year ended Mrs. Beverly took a position as a nurse in a home at Cathedral City. She invited a Mrs. Beavers, also a nurse, to spend the evening of December 31st with her and to stay with her that night in the auto court cabin. The two women went from that cabin, across the highway, to the Knotty Pine Inn, where there

was a restaurant, bar and living room. Soon after they had taken seats at the bar defendant entered and sat down next to Mrs. Beverly. He had stopped work at 4:30 in the afternoon, had drawn on his pay, and had spent the intervening time visiting and planning for the evening. He asked Mrs. Beverly to see him alone. She refused and he left the bar.

Mrs. Beverly and Mrs. Beavers spent the remainder of the evening at the Knotty Pine. Defendant returned to that place and conversed with Mrs. Beverly. About midnight she went into a booth, put her head on her arm, and went to sleep. About 2 o'clock in the morning, January first, the two women left Knotty Pine for the auto court cabin. A Mr. Pickell accompanied them as far as the edge of the patio in front of their cabin. He then returned to Knotty Pine.

As Mrs. Beverly unlocked the door of the cabin, Mrs. Beavers noticed that a light was on in the front room. The women entered and Mrs. Beverly crossed the room and sat down on the bed opposite the door. Mrs. Beavers turned and saw defendant lying on the other bed near the door. She touched Mrs. Beverly, saying: ''There's your husband, Charlotte, let's get out of here,'' and moved toward the door. Mrs. Beverly walked over to the bed, shook defendant, and said, ''Marvin, what are you doing here in bed with your clothes on?'' Defendant raised up and lifted a rifle which had been concealed by his body. The rifle belonged to the son of Mrs. Beverly and customarily hung on a nail over the kitchen doorway. Shells were kept in a near-by drawer.

Defendant aimed the rifle at Mrs. Beverly. She said, ''You are not going to shoot me with that gun,'' and then quickly followed Mrs. Beavers out of the front door. A few feet from the cabin she hesitated; then despite urgings of Mrs. Beavers to come away, she turned and stepped back into the cabin doorway. Mrs. Beavers immediately heard the discharge of the rifle and saw Mrs. Beverly fall just inside the door. Mrs. Beavers ran toward Knotty Pine and when half way to the highway, she saw the light go out in the cabin.

People from Knotty Pine rushed to the cabin and found it dark. After one woman called several times, defendant responded, asking what she wanted. She inquired for Mrs.

Beverly and defendant replied, "Charlotte is all right. She is here." He also said he could not turn on the light. One of the group finally stepped partly in the room and turned the electric bulb in the socket. Glancing down she saw the body of Mrs. Beverly, with a rug or blanket over the head. An autopsy disclosed that death resulted from a brain laceration caused by a bullet which entered the head approximately 2 inches above and forward of the upper edge of the right ear, and proceeded downward. The shot was fired from the rifle which defendant had concealed in the bed.

As the women from Knotty Pine questioned whether Mrs. Beverly was really dead, defendant walked up and slipped his arms underneath the body and said, "See, there is nothing wrong," and then let the body fall. He also said, "Oh, she is all right." Still holding the rifle, he then proceeded to leave by the back door. As he crossed the highway, two men circled behind him and relieved him of the rifle. Officers were called and soon arrived at the scene. About 4 a. m. two of them entered defendant's room at the Cathedral City Motel. The room was dark and defendant was in bed in his underwear, with his outer clothing on a near-by chair. The officers took him to Knotty Pine. He maintained that he had practically no recollection of anything that had occurred between the time he left Knotty Pine about midnight and the time the officers arrived.

As defendant walked with the officers to the Knotty Pine, and within half an hour of his arrest, he complained of a pain in the side of his head. His head was not examined. At Knotty Pine he was given a glass of water and two cups of coffee. As an officer started for the kitchen to bring in the second cup, defendant said, "Did I ku———." The officer turned and asked defendant what he said but defendant would not repeat it. Defendant testified that his lapse of memory from midnight to 4 a. m. was due to large quantities of liquor which he had consumed after leaving work in the afternoon. He described in detail where and when he had had these drinks. The record shows at most a conflict of evidence on the issue whether he became intoxicated, with but slight corroboration of his own testimony. A friend whom defendant saw about 7:30 in the evening and met again later at a night club testified that defendant drank heavily and was flushed and flighty in his talk. One of the owners of Knotty Pine stated that defendant was around

her kitchen and living room; that she saw on her kitchen table a quart bottle of whiskey in a bag; and that as she did not allow drinking in the place she handed the bag to defendant and ordered him to leave. None of the many people who visited with defendant during the evening at Knotty Pine or observed him at the time of and after the commission of the crime testified that he was intoxicated. To the officers he appeared to be normal.

Defendant claims that it was physically impossible for the shooting to have occurred in the manner described by Mrs. Beavers. He argues that if he had shot Mrs. Beverly as she entered the doorway, the bullet would necessarily have penetrated her body on the left and not the right side, and that there was no way in which he could have aimed from a position above Mrs. Beverly which would have been required for a shot to penetrate her head at the downward angle.

Defendant's argument fails to give weight to the fact that between the time the women left the cabin and the shooting, Mrs. Beavers walked some 10 feet from the door and, according to her estimate, one or two minutes elapsed. It may have been less. Even an interim of half a minute or less gave the defendant an opportunity to move about in the cabin. Also, on her reentry Mrs. Beverly may have assumed a position other than upright. A motion of her head downward or sideways would account for the angle of penetration of the bullet.

Since it was conclusively proved that the fatal shot was fired from the rifle held by the defendant, he cannot deny his participation in the shooting, but is relegated to arguing for a construction of the evidence which would indicate that the killing might have been accidental. All of these issues including the conflicting inferences to be drawn from the evidence were for the determination of the jury and were resolved against the defendant.

The defendant argues that an examination of the gun barrel might have disclosed the finger prints of the deceased and support the theory of an accidental killing; that a paraffin test of defendant's hands within a few hours after the shooting might have determined whether he shot the gun; that proof of the presence or absence of powder marks on the head of the victim might have helped the defense; and that various other witnesses might have been produced

by the prosecution and other tests might have been applied.

There is no compulsion on the prosecution to call any particular witness or to make any particular tests so long as there is fairly presented to the court the material evidence bearing upon the charge for which the defendant is on trial. (*People* v. *Larrios*, 220 Cal. 236, 251 [30 P.2d 404]; *People* v. *Simpson*, 66 Cal.App.2d 319, 329 [152 P.2d 339].)

Exception is taken to the fact that on *voir dire* prospective jurors were questioned concerning their understanding of various legal principles. No authority is cited to the effect that such questioning is prejudicially erroneous. But it is asserted that despite admonition by the court and the sustaining of some objections, the prosecuting attorney persisted in instructing the jurors as to the law, often incorrectly, and that this was misconduct because it preceded the testimony and left the jurors with the impression that certain matters were in issue which never subsequently arose. An examination of the record reveals nothing in this respect to support the claim of prejudice or to serve as a foundation for a charge of misconduct. (See *People* v. *Bennett*, 79 Cal.App. 76, 90-91 [249 P.20], and cases there cited.)

Certain statements made by the prosecuting attorney in his argument to the jury are assigned as misconduct. For example, he referred to the "irresponsibility of this defendant, his plain worthlessness. . . ." This was said in connection with comments upon the business venture of defendant and the deceased. In view of defendant's own testimony as to his drinking habits and other activities, the statement cannot be said to be without justification.

Complaint is made that in his argument the prosecuting attorney stated that defendant was attempting to induce the deceased to take him back, and ascribed to defendant motives of jealousy and anger caused by the fact that the deceased spurned him. These statements were justified in view of the evidence of defendant's repeated attempts to talk to the deceased alone, and of her preparations for a return to Boston. It is unnecessary to review each of the remarks to which objection is made. There was some justification for all of them and if any could be said to constitute misconduct, none would justify a reversal.

It is charged that the court committed prejudicial error in allowing the prosecution, over objection, to cross-

examine defendant as to matters about which he had not been examined in chief. (Pen. Code, § 1323.) These matters related to defendant's past, the fact that he had a former wife, his business relations with the deceased, her plan to go away, and the like. To one of the questions objection was sustained; to several others it was overruled. On direct examination defendant had been interrogated relative to his occupation as a plumber for 20 years, his acquaintance with the deceased dating from the year 1943, and his employments and residences thereafter. The cross-examination for the most part was directed to bringing out all facts concerning the matters touched upon in direct examination. (*People* v. *Mammilato,* 168 Cal. 207, 213 [142 P. 58].)

It is contended that the court should have instructed the jury that there was no evidence of premeditation or "lying-in-wait." It is argued that mere possession of a gun does not show premeditation; that there was no showing of a plan or design on the part of the defendant to kill anyone; that he simply went to the room where he had lived, and taking the gun for some purpose, lay down in a drunken stupor. In connection with the suggestion of self-defense, mention is made of a head injury allegedly suffered by defendant. The record contains no evidence of any head injury at the time of the killing. When defendant was arrested in his own room some hours after the shooting, he complained of a throbbing pain or splitting headache over his right ear. He asked the officer if he had hit him and the officer replied in the negative. That he may have suffered from a headache is not unlikely in view of the events of the night.

If the crime was committed by lying in wait it was by statute, murder of the first degree (Pen. Code, § 189), and the question of premeditation was not further involved. However, the issue of premeditation, if necessary to a determination of the case, went to the jury with correct instructions and there is sufficient evidence to support the verdict thereon.

But it is contended that the question of lying in wait was erroneously submitted to the jury and that the two instructions given on the subject were incorrect and prejudicial. The first was: "Murder which is perpetrated by lying in wait is declared by our law to be murder of the first degree, and if you should find that the defendant com-

mitted that crime, you will have no choice but to designate the offense as murder in the first degree.'' The second was a modification of an instruction proposed by defendant: ''You are instructed that 'lying in wait' consists of concealment for the purpose of taking a victim unawares. It means hiding in ambush or concealment. It does not necessarily refer to the position of the person, but rather to his location, and the purpose of taking the person attacked unawares.'' Defendant contends that in order to commit a murder ''by means of . . . lying in wait . . .'' (Pen. Code, § 189), the lying in wait must be the ''means,'' method or proximate cause by which the defendant is enabled to kill his victim before he can escape; that the killing must be accompanied by surprise and concealment, and must not be disconnected from them; that the evidence must show a shot from ambush upon a victim unaware of his danger, and without chance to escape; that discovery of the physical presence of the aggressor is not the vital element, but that the danger and the lack of chance to escape are controlling. (See definitions of term found in 25 Words and Phrases, Perm. ed., p. 739; 40 C.J.S. p. 880, § 31; 2 Bouvier's Law Dict., 3d ed. p. 2058.)

Here, defendant argues, there could be no lying in wait because the evidence established that there was no element of surprise or concealment, no shot from ambush, but instead a clear escape by the victim. How, defendant asks, could he be lying in wait when he was asleep? Mrs. Beverly was so little surprised, he asserts, that she went over to the bed, and said, ''Marvin, what are you doing here in bed with your clothes on?'' He contends that even if he were lying in wait originally, the ambush ended and the lying in wait ceased when Mrs. Beverly went out of the door, and was not in existence when she reappeared in the doorway and the shooting occurred.

This argument is not convincing. Although there appears to be no California case precisely defining the phrase ''lying in wait,'' it has been applied in other jurisdictions to a number of factual situations wherein the victim has been aware of the physical presence of the aggressor. It is said in 26 American Jurisprudence, page 165, section 16, ''As a general rule to constitute lying in wait to commit murder the perpetrator must be in ambush, or concealment for the purpose of taking his victim unawares. In some cases, however,

the term has been applied to facts other than a concealment in ambush. For instance, it has been applied where it appeared that the victim was induced by the wife of the accused to come to their home, and that the accused, who had stayed there for the purpose of killing him, did so as the victim was leaving the premises after having talked to the accused and his wife for a short time.''

A review of authority for the statement that the term ''lying in wait'' may be applied to facts other than a concealment in ambush is found in Annotated Cases, 1916C, at page 971. See, also, *Jackson* v. *State,* 180 Tenn. 158 [172 S.W.2d 821] ; *State* v. *Jackson,* 71 Mont. 421 [230 P. 370, 373] ; *Williams* v. *State,* 130 Ala. 107 [30 So. 484] ; *State* v. *Walker,* 170 N.C. 716 [86 S.E. 1055] ; *State* v. *Dooley,* 89 Iowa 584 [57 N.W. 414].

When defendant entered the cabin surreptitiously, after Mrs. Beverly's repeated refusals to see him alone, took the gun from the wall, loaded it, and lay down on the bed concealing it, he was literally ''lying in wait.'' The elements of waiting, watching, and secrecy all were present. The fact that the light was put on in the cabin did not destroy the secrecy of defendant's presence. The fact that he may have fallen asleep did not terminate the lying in wait, any more than did the fact that when he aimed the gun at Mrs. Beverly, she fled beyond the doorway, only to return to it in a few seconds. Defendant's presence in the cabin was unexpected, and obviously, she was unaware of her danger, of the tenacity of defendant's grim objective and of his purpose to kill her. Her actions in the unexpected situation were not unnatural. The fact that she was shot on her return to the doorway indicates that defendant's action was not hasty, and that his watch to kill was continuous and unbroken. This lying in wait was the ''means'' through which defendant accomplished his purpose. The evidence justified the submission of the issue to the jury and was sufficient to support the inference that the lying in wait was a part of the defendant's plan to kill and the means by which he carried out the plan.

■ Defendant contends that prejudicial error was committed in the giving of an instruction as to the effect of an accusatory statement. The correctness of the instruction in the abstract is not questioned but it is argued that the jury might have been misled for the reason that there was no

evidence in the record of any accusatory statement, and that the error was accentuated by the fact that the subject of accusatory statements had been brought before at least three of the jurors on *voir dire* examination. In the absence of any facts to which the instruction might apply it should not have been given. However, the giving of an instruction outside the issues or beyond the applicable facts is not reversible error unless it can be said to have been prejudicial. (*People* v. *Silver*, 16 Cal.2d 714, 722-3 [108 P.2d 4]; *People* v. *Boggs*, 12 Cal.2d 27, 37 [82 P.2d. 368]; *People* v. *Shallenberger*, 25 Cal.App.2d 402, 407 [77 P.2d 506]; *People* v. *Russell*, 59 Cal.App.2d 660, 664 [139 P.2d 661].) Here there is no indication of prejudice. The jurors were presented with clear and convincing proof of defendant's guilt, and within an hour of submission of the cause to them returned their verdict of guilty. It is obvious that the omission of the instruction would not have altered their conclusion in any way.

■ The court instructed the jury in the language of section 1105, Penal Code, concerning proof of mitigating circumstances, without explaining the meaning of the statute. Such an instruction has been disapproved in recent cases. (*People* v. *Valentine*, 28 Cal.2d 121, 132-3 [169 P.2d 1]; *People* v. *Lindley*, 26 Cal.2d 780, 793-4 [161 P.2d 227]; *People* v. *Thomas*, 25 Cal.2d 880, 895-6 [156 P.2d 7].) But the error in giving the instruction has frequently been held nonprejudicial under varying factual situations, as where the evidence of guilt is convincing, where there is little if any evidence of mitigating circumstances, where other instructions sufficiently clarify the subject, or where it is improbable that a reasonable jury otherwise correctly instructed would have rendered a different verdict. (*People* v. *Bernard*, 28 Cal.2d 207, 214 [169 P.2d 636]; *People* v. *Lindley, supra,* 26 Cal.2d 780, 793; *People* v. *Kelso,* 25 Cal. 2d 848, 853 [155 P.2d 819]; *People* v. *Madison,* 3 Cal.2d 668, 677, [46 P.2d 159]; *People* v. *Diaz,* 61 Cal.App.2d 748, 753-5 [143 P.2d 747]; *People* v. *Perez,* 19 Cal.App.2d 472, 476-8 [65 P.2d 1319].)

It is contended that here the error was prejudicial because of many asserted mitigating circumstances, such as accidental shooting in self-defense, alcoholic narcosis, stupor, lapse of memory, distraction from head injury. As above stated, the record contains no evidence of any head injury at the

time of the killing. The claim of accidental shooting in self-defense is without substantial support in the evidence.

The mitigating circumstance principally stressed by defendant was that of his claimed unconsciousness or intoxication. The jury was fully instructed to the effect that an act committed without being conscious thereof is not a crime; also, that if the defendant was so deeply under the influence of intoxicating liquor as to have been incapable of forming in his mind the malice which is an essential element of murder he could not be convicted of any offense higher than manslaughter. Both of these instructions were given at defendant's request. In addition, the jury was instructed that if by virtue of his mental condition or his use of intoxicating liquor the defendant was unable to form an intent, then the verdict must be in his favor. With these specific instructions, two in the language proposed by defendant, it is apparent that the jury could not have been misled by the instruction in the language of section 1105. From the evidence it might well be inferred that at the time of the killing he was not in such a state of intoxication and stupor as to be unable to know what he was doing.

It is significant that despite defendant's asserted continuous drinking from 4:30 in the afternoon, he showed a complete knowledge and memory of his actions until about midnight, recalling the number and brand of his drinks. Shortly thereafter he entered the cabin of Mrs. Beverly, whereupon his mind is asserted to have promptly become a blank. However, he was sufficiently rational after the killing to return to his own room, place his shirt and trousers neatly on a chair by his bed, and his shoes and socks near by on the floor, and go to bed; also to dress again without delay or fumbling when aroused by the officers. As said by this court in *People* v. *Murphy,* 1 Cal.2d 37, 40 [32 P.2d 635], in sustaining a death penalty conviction against the claim of unconsciousness from voluntary intoxication: "It is significant that defendant when on the stand testified in detail as to what transpired immediately before and immediately subsequent to the wrongful assault on the decedent. As to these events his recollection was reasonably vivid. His memory was faulty only as to the period during which the fatal injuries were being inflicted."

The question of the effect of defendant's asserted intoxication was one for the jury under adequate instructions,

which were given. The evidence warrants the inference, as it did in *People* v. *Honeycutt,* 29 Cal.2d 52, 62 [172 P.2d 698], that during the afternoon preceding the killing the defendant might deliberately have resorted to the use of intoxicants with the object of dulling any compunctions he thought might otherwise hamper him in effecting his purpose. Under any rational view of the evidence and the instructions as a whole, the verdict cannot be set aside.

The judgment and order are affirmed.

Gibson, C. J., Edmonds, J., Carter, J., Traynor, J., Schauer, J., and Spence, J., concurred.

Appellant's petition for a rehearing was denied December 29, 1947.