[Crim. No. 3386.   First Dist., Div. Two.   May 14, 1958.]

THE PEOPLE, Respondent, v. ROBERT HAMILTON
McNEAL, JR., Appellant.

John J. Taheny and Joseph A. Bonacina for Appellant.

McCutchen, Thomas, Matthew, Griffiths & Greene, Brent M. Abel and Arthur R. Albrecht, as Amici Curiae on behalf of Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, and Arlo E. Smith, Deputy Attorney General, for Respondent.

DOOLING, J.—Appellant was convicted by a jury of first degree murder which fixed his punishment at life imprisonment. Appellant had formerly lived with Mrs. Vance as her paramour. On July 4, 1956, at about 12:30 a.m. appellant brought a record player to Mrs. Vance's home. Present in Mrs. Vance's home at the time was the decedent Peterson who had also been a recipient of Mrs. Vance's sexual favors. Appellant after setting down the record player left immediately and backed out of the driveway so rapidly that his car was "reeling and rolling."

Approximately 20 minutes later appellant telephoned to Mrs. Vance and told her that she might as well have a good time because this would be her last. Later Mrs. Vance and Peterson left the house. Mrs. Vance entered Peterson's automobile from the passenger side at which time the dome light of the car was illuminated. After she entered the car Mrs. Vance heard a sound like a rock hitting the car. She got out and found Peterson lying on the ground beside the car. Peterson died at 8:19 a.m. from a bullet wound.

Sometime between 1 and 2:30 a.m. that morning appellant entered the Edris Café. He asked the cook to call the police saying that he had just shot at his girl but had missed her. He asked the cook to take his gun before "I'm tempted to go back down and really finish her off."

Appellant went with the arresting officer to the area of the shooting, indicated to him the spot where he had parked his car and told him that he had seen people come out of the house, saw the car lights go on and shot at the car. Later at police headquarters appellant said that he saw the couple leave the house when the dome light went on, saw a figure outlined in the light and shot at the figure. In a later statement appellant said that the rifle belonged to his father, that he must have gone home to get it after delivering the record player, that the rifle was never loaded so he must have loaded it and that he wanted to throw a good scare into somebody. Appellant also stated that seeing Peterson with Mrs. Vance made him feel angry and sick to his stomach and he wanted to get away from there.

A statement taken from Peterson in the hospital was introduced. In the statement after saying: "I'm going to die," Peterson said that appellant had shot him, that he saw appellant in the dark behind the garage and that just before he shot appellant told him that he was going to kill him on account of Jessie (Mrs. Vance).

At the trial appellant testified that he remembered getting into his car after delivering the record player. He remembered nothing thereafter until there was a flash of light and the rifle shot.

Appellant had purchased a pint of vodka about 6 p.m. on July 3, but the amount consumed by him was not established. That evening he and a Mr. Williams had drunk a half pint of whisky. When appellant left Williams at about midnight he did not appear to be drunk nor did he appear to be drunk when he entered the Edris Café after the shooting. A blood test of appellant taken at 4:15 a.m. showed .16 percent alcohol in his blood.

Appellant offered expert testimony to the effect that because of the combined effect of his emotional disturbance, the concentration of alcohol in his blood and his neurotic temperament, he did not have the capacity for deliberation or premeditation nor for forming an intent to lie in wait and kill. The prosecution produced expert testimony that with .16 percent alcohol in the blood all persons would be under the influence of alcohol but only 50 percent would be classified as intoxicated and that such a person would be able to deliberate and premeditate the killing of a human being. A psychiatrist produced by appellant admitted that he might have had the intent to kill. There was evidence that alcohol is fully absorbed into the blood about one hour after consumption and that it leaves the blood at the rate of .02 percent hourly. From this it is argued for appellant that there must have been over .18 percent alcohol in his blood at the time of the killing.

The court instructed the jury on first degree murder both on the theory of deliberation and premeditation and of lying in wait. It is contended that there is no sufficient evidence to support either theory. It is argued that there is no evidence that with .18 percent or more alcohol in his blood appellant could have the mental capacity for the premeditation and deliberation which is necessary for murder in the first degree. The jury however had testimony that shortly before as well as immediately following the shooting appellant did not appear to be intoxicated, the testimony that with .16 percent alcohol in his blood appellant would be capable of deliberation and premeditation and the admission of his own expert that he might have had the intent to kill. The jury could consider the testimony that he did not appear to be intoxicated, with the expert evidence and the evidence that

appellant had threatened Mrs. Vance over the telephone, had driven to his home, gotten and loaded the gun, returned to Mrs. Vance's home and waited until Peterson and Mrs. Vance appeared and then fired the fatal shot and from all of the evidence reasonably have concluded that appellant not only could but did deliberately plan and execute the killing. They could with equal reason conclude from all of the evidence that appellant could and did form the intention of lying in wait for the purpose of committing murder.

The court gave the following instructions on the subject of lying in wait:

"Murder which is perpetrated by lying in wait is declared by our law to be murder of the first degree, and if you should find that the defendant committed that crime, that is, murder, and you will have no choice but to designate the offense as murder in the first degree, if you find that he committed the act while lying in wait.

"The words 'lying in wait' do not refer to the position of the body of the person who commits a murder. There may be a 'lying in wait' within the meaning of the law where such person is sitting down, standing or to a degree moving about. The gist of 'lying in wait' is that the person places himself in a position where he is waiting and watching and concealed from the person he intends to murder. There is nothing in the law that requires that the 'lying in wait' exist for or consume any particular period of time before the firing of a shot or other act which causes death. It is necessary however that the act causing death be preceded by the outgrowth of the 'lying in wait.'

"You are instructed that if you find the defendant guilty of murder, and that the defendant committed that crime while lying in wait then as a matter of law you must fix the degree as murder in the first degree. If you find the defendant guilty of murder, and if said murder was not committed while lying in wait you may nevertheless fix the degree as murder in the first degree if it was a willful, deliberate and premeditated murder. If you find the defendant guilty of murder, and if said murder was not committed while lying in wait, nor was it willful, deliberate and premeditated then you should fix the degree as murder in the second degree."

Appellant's counsel argues that it is error to instruct that where murder is committed by lying in wait it is murder in the first degree, without requiring a finding of deliberation and premeditation. ■ The cases in California are clear,

however, that where murder is committed by lying in wait it is "murder of the first degree by force of the statute" (*People* v. *Sutic,* 41 Cal.2d 483, 492 [261 P.2d 241]) or "because of the substantive statutory definition of the crime" (*People* v. *Thomas,* 41 Cal.2d 470, 474 [261 P.2d 1]). "If the killing was committed by lying in wait, it was murder of the first degree by force of the statute [citation], and the question of premeditation was not further involved." (*People* v. *Byrd,* 42 Cal.2d 200, 208 [266 P.2d 505]; and see *People* v. *Merkouris,* 46 Cal.2d 540, 560 [297 P.2d 999]; *People* v. *Tuthill,* 31 Cal.2d 92 [187 P.2d 16].) ■ In the face of these clear holdings by the Supreme Court an argument for a different construction of the code cannot be successfully made to an intermediate court which is bound to follow those decisions.

■ In the amicus curiae brief it is argued that the evidence was not sufficient to justify the giving of lying in wait instructions. The evidence shows that after threatening Mrs. Vance, driving to his home, obtaining the gun and loading it appellant drove his car onto a side road near the Vance home, got out of the car, walked through some shrubbery and stood behind the garage where he could observe persons leaving the house while he stood in darkness. The jury could reasonably find from these facts that appellant deliberately concealed himself and waited for the purpose of committing murder. The case is not at all like *People* v. *Merkouris, supra,* 46 Cal.2d 540, wherein the court found insufficient evidence of any stealth or concealment. Here the manner of approach, not by any path or roadway, but through shrubbery and to a position of obscurity in the darkness will reasonably support a finding of stealth, concealment and furtiveness for the purpose of the murder. ■ The fact that just before the shooting the victim discovered appellant's presence does not prevent the crime from being committed by lying in wait. It is the appellant's intention to ambush the victim which is controlling and the fact that the victim discovers his presence before the killing does not change or affect that intention. (*People* v. *Tuthill, supra,* 31 Cal.2d 92, 100-101.)

■ The amicus curiae brief further attacks the instructions on this subject claiming that they lacked the essential feature that the lying in wait must be for the purpose and with the intention of committing murder. We are satisfied that this argument puts too narrow a construction on the instructions as a whole. The jury was told: "The gist of

'lying in wait' is that the person places himself in a position where he is waiting and watching and concealed from *the person he intends to murder.*" (Emphasis ours.) The emphasized language makes clear that the *intent to murder* the person is an essential part of the lying in wait. The jury could not reasonably have understood it otherwise. Complaint is also made of the use of "while" instead of "by means of" lying in wait. The instructions fairly read could not mislead the jury in this respect. Furthermore the jury was expressly instructed: "It is necessary . . . that the act causing death be . . . the outgrowth of the 'lying in wait.'"

■ The court in reading an instruction on second degree murder inadvertently, by what was apparently a slip of the tongue, substituted the word "first" for "second" in one sentence. This error might have been serious except for what later occurred. After the jury had been deliberating for several hours the jurors returned to the courtroom and, through their foreman, asked the court for a restatement of the difference between first and second degree murder. As a part of the instructions reread to the jury in response to this request the court reread correctly the very instruction in which the erroneous substitution of "first" for "second" had previously occurred, so that on the second reading the instruction used the proper designation of "second" degree murder. We must assume that the jury followed the correct instruction as thus reread to them at their request and could not have been misled by the earlier erroneous reading.

As a part of the instructions given in response to this request for a restatement of the difference between the degrees of murder, the court, after reading the code sections distinguishing the two degrees, said:

"It seems to me that those two Sections are pretty clear, don't you think? Now, are they or are they not to you? I can give you some extended instructions if you wish but you first take the original definition of murder which is the unlawful killing; say, there was a killing, yes. He was killed, yes. Was it lawful or unlawful? It was unlawful. Was it done with malice aforethought? Yes. Then, that is murder.

"Then find out whether it was first or second degree. Was it perpetrated by means of poison, was it perpetrated by lying in wait? Well, was it or wasn't it it? If you decide it was perpetrated by lying in wait, then the murder is first degree. . . . Was it by any other kind of willful, deliberate and pre-

meditated killing? Was it or was it not? If it was, it's first degree and if it wasn't, why, it isn't. . . ."

The court followed this by rereading the basic formal instructions previously given on the subject. It is argued that in the first part of this informal instruction above quoted the court took from the jury the question of possible innocence and in effect told the jury that appellant was guilty of murder, leaving to the jury only the question of degree. While the court might better have framed the answers to its questions in less positive fashion, the obvious purpose of the judge, which we believe the jury could not have misunderstood (particularly in view of the other instructions on the subject given both before and after this extemporaneous exposition) was to illustrate the reasoning process by which the jury should arrive at its conclusion. The judge obviously did not intend (and the jury cannot well have believed that he did) to instruct the jury that the answers given were the answers which must be given, but only to illustrate that if those answers were given and the appellant in fact found guilty of murder, they should then proceed to determine the degree of murder in the manner thereafter indicated.

There is also some complaint of the failure of the trial judge to give certain instructions on this occasion requested by the appellant's counsel. The jury had asked only for a restatement of the difference in the degrees of murder and the court restated the basic instructions on that subject. The instructions were directed to and adequately answered the jury's request and we can find no error in the refusal of the court to go further.

There was no error in the court's refusal to permit the placing of a yellow piece of paper on a diagram of the area of the killing to designate the position of Peterson's automobile. The court said: ". . . she can take a pencil and mark it but using another piece of paper to add to the exhibit that is already in evidence, is confusing." The matter lay well within the court's discretion and we can find neither error nor prejudice in this incident.

Appellant offered a piece of granite, part of a barbecue pit, noticed near the scene of the killing on December 3, 1956. This had a mark or gouge on it which appellant contended might show that the bullet had ricocheted. The court sustained an objection stating: "It simply is so remote that it renders it immaterial. . . ." We find no error in this ruling. The mark was not noticed until five months after the

shooting and no evidence was offered to connect it with the shooting except the mark on the rock itself.

The People were permitted on rebuttal to introduce evidence tending to show that the bullet had not ricocheted. The appellant had introduced some evidence that the bullet might have ricocheted, although the stone was excluded, and in any event the effect of this evidence could hardly have been prejudicial.

Appellant offered in evidence the hospital record of the victim Peterson. The court withheld its ruling and the matter was not thereafter called to the court's attention. Appellant's counsel was aware that the court had not given a definite ruling, but did not again raise the matter or ask for a definite ruling. In the state of the record appellant cannot complain of this incident on appeal. (*Spanfelner* v. *Meyer*, 51 Cal.App.2d 390, 392 [124 P.2d 862].)

The judgment is affirmed.

Kaufman, P. J., and Draper, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 9, 1958.