[Crim. No. 7516. Second Dist., Div. Two. Dec. 21, 1961.]

THE PEOPLE, Plaintiff and Respondent, v. ALVIN CYRUS KAHN, Defendant and Appellant.

Ellery E. Cuff, Public Defender, and James L. McCormick, Deputy Public Defender, for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and A. Douglas MacRae, Deputy Attorney General, for Plaintiff and Respondent.

FOX, P. J.—Defendant was charged with violating section 187, Penal Code, in that on or about June 17, 1960, he murdered William Baskin. A jury returned a verdict of first degree murder. A jury trial having been waived on the issue of punishment, the court determined that defendant should be imprisoned for life. He has appealed from the ensuing judgment.

Defendant's sister, Sophia Kahn, became acquainted with Baskin in October, 1959. They were later engaged and planned to be married on January 17, 1960. Miss Kahn terminated her employment on December 17, 1959, in anticipation of their marriage. Her coworkers gave her a party and presents.

At approximately 4:30 in the morning on January 7, 1960, Baskin, accompanied by his son, called on Sophia at her home and told her that he was not going through with their contemplated marriage. She inquired as to the reason, and told him that all arrangements had been made for the wedding. He stated: "I am just not marrying anyone."

Sophia was very much upset. She returned the presents with defendant's help. She cancelled the wedding plans and requested her former employer to reinstate her, which he did. Sophia explained to defendant what had happened, and how terribly humiliated she was. They discussed the matter several times, the last time in February 1960. Defendant learned that their mother suffered a breakdown as a result of the broken engagement. He was very much disturbed because of the reaction on both Sophia and their mother. He felt a great injustice had been done.

Also, defendant learned from his sister that Baskin was short-tempered and carried a gun. Sophia did not again go out socially for some time.

Mrs. Gisele Bouchard and her husband managed a 14-unit apartment house in Long Beach owned by Baskin. They lived at, and also took care of, his home on Livingston Drive and Bennett Street, in Long Beach, with their three daughters, Lucy, age 18, and their twins, Michele and Francine, age 16.

At approximately 9:15 on the morning of June 17, 1960, defendant came to the Baskin home and asked for Mr. Baskin, stating that he was a friend of his. Michele told him that Baskin was playing golf and would be home at 12:15. Defendant then left and returned at approximately 11 o'clock. She opened the back door and said: "You come in and wait for him [Baskin]. He will be back in a few minutes." Michele then informed her mother that "we have company for Mr. Baskin." Mrs. Bouchard went to the kitchen door and said to defendant: "Come in the living room and sit down." Defendant stated: "I am Mr. Baskin's best friend," but he did not disclose his name. Mrs. Bouchard then said: "Take a chair and make yourself comfortable." She excused herself and told Michele to turn on the hi-fi. A few minutes later Lucy observed him alone in the living room; he was walking very nervously in circles. Mrs. Bouchard later returned to the living room and talked with defendant. When she heard the garage door open, she said to him, "Excuse me, Mr. Baskin's coming." Mrs. Bouchard told Baskin he had company. He went into the living room while Mrs. Bouchard remained in the kitchen with Michele. She heard Baskin say, "I don't know you." Defendant replied, "I am Sophia's brother." Defendant then called "the two ladies" in the kitchen and said: "Come sit down on the couch beside Mr. Baskin to hear what I say." When Michele and her mother entered the living room, defendant was standing and holding a gun pointed at Baskin, who was seated. They were only about two feet apart. Defendant was nervous. He ordered Mrs. Bouchard and Michele to sit down on the couch beside Baskin. He told them, "Just listen; don't move." He then said to Mrs. Bouchard, "You have some other girls?" She replied, "I have Lucy in the bedroom." Defendant said: "Call her and tell her to come sit down." Mrs. Bouchard called twice, but Lucy did not appear. According to Mrs. Bouchard's testimony, defendant stated to Baskin: "I came here to ask you $20,000 cash for my sister, Sophia, to give her a trip around the world because you broke her heart and to forget when you quit with her engagement." Baskin replied: "I don't have that money now." Defendant, according to

Michele, wanted the money "right now." Defendant replied: "I will be happy to kill you." Mr. Baskin arose and said to defendant: "You are Jewish and I am Jewish, both brothers, we don't kill each other." Baskin moved close to defendant. Defendant backed up. Defendant held his gun pointed at Baskin.

Meanwhile, Lucy had opened the bathroom door and saw Baskin and defendant whirling and pushing each other. Defendant was holding the gun in his right hand about a foot from Baskin's chest. She heard the shot. Mrs. Bouchard also heard the shot but she did not see the shooting because she had turned her head away and was clinging to Michele. Baskin fell to the floor dead, the bullet passing through his heart. Defendant ran through the kitchen and jumped into his car. Mrs. Bouchard ran into Baskin's bedroom to get a gun he kept between the mattresses. She went out the kitchen door and shot twice, on Bennett Street, to attract the police. She then reentered the house and emerged from the front door onto Livingston Drive, where she saw defendant getting into his car, and she fired at him. Defendant drove off in the direction of Long Beach while Mrs. Bouchard returned to the house and called the police and an ambulance. Throughout this affair Baskin was unarmed.

Defendant testified that he had met Baskin in the latter's store, in Long Beach, some time after Sophia became engaged to him; he had not seen him, however, since that time. Defendant and his sister were very close, and he felt a great injustice had been done to her. Sophia, according to defendant, was in the throes of a nervous breakdown because of the broken engagement, as was their mother, who went to the hospital as a result. Sophia, however, never suggested that she should receive compensation. Defendant testified that he went to Baskin's home with a loaded gun, which he had bought originally for the purpose of doing away with himself. He took the gun with him to insure Baskin's listening to him, and also possibly as self-protection. Defendant further testified that when Baskin stood up in the living room, defendant's first thought was that Baskin was going for a gun. Baskin grabbed defendant around the shoulders. It was at that moment that the gun was discharged without defendant realizing it; he was stunned and dismayed, but realizing what had happened, he left the house through the kitchen door where he had entered. He stated that he did not run from

the house; he ran only after hearing the shots fired by Mrs. Bouchard.

 The decisive question on this appeal is, Did the court commit prejudicial error in giving the instruction on "Lying in Wait."\* Penal Code section 189, in part, reads: "All murder which is perpetrated by means of poison, or lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing, or which is committed in the perpetration or attempt to perpetrate arson, rape, robbery, burglary, mayhem, . . . is murder of the first degree. . . ."

 *People* v. *Merkouris*, 46 Cal.2d 540 [297 P.2d 999], at page 559, states: "[I]n order to constitute lying in wait the elements of waiting, watching and concealment must be present [citations]." In *People* v. *McNeal*, 160 Cal. App.2d 446, 451 [325 P.2d 166], in discussing the propriety of giving an instruction on lying in wait, the court stated that it is the defendant's "intention to ambush the victim which is controlling. . . ." The court there approved an instruction which told the jury "[t]he gist of 'lying in wait' is that the person places himself in a position where he is waiting and watching and concealed from *the person he intends to murder.*" (Pp. 451-452.) "The fact that just before the shooting the victim discovered appellant's presence does not prevent the crime from being committed by lying in wait." (*Id.*, at p. 451.) Counsel for both sides agree that these two cases correctly state the law on "lying in wait." They disagree, however, on whether the evidence is sufficient to show concealment.

 It will be recalled that when defendant first went to the Baskin home on the morning in question he simply "asked for Mr. Baskin" and was told by Michele that Mr. Baskin was playing golf and that he would be home at 12:15. In the course of the conversation defendant stated that he

---

\*The court gave CALJIC 302-E on "Lying in Wait" which reads:
"To constitute lying in wait, as the term is used in these instructions, a person's conduct must involve an intent to take another person unawares so as to do him bodily injury, and must include, as a means to that end, a waiting and watching for an opportune time to do the act, and also either a concealment in ambush or some other secrecy of design to take the other person by surprise.

" 'Lying in wait' does not require any particular position of the body, or that the designing person refrain from moving about, or that he entice or trap the object of his design into any strange or puzzling situation, or that the 'lying in wait' continue for any particular period of time, provided that its duration is such as to show a state of mind equivalent to premeditation and deliberation."

was a friend of Baskin. He thereupon left the premises. There is nothing whatever in this incident to suggest concealment. Defendant reappeared at the back door of the Baskin home at 11 o'clock or a little later that morning. Michele greeted him, opened the back door, and said: "You come in and wait for him. He will be back in a few minutes." In response to this invitation defendant entered the kitchen. It was at this point that Michele informed her mother that Mr. Baskin had company. Mrs. Bouchard then went to the kitchen door and said to defendant, "Come in the living room and sit down." She suggested that he make himself comfortable. During the course of this apparently brief conversation, although defendant did not state his name he identified himself as being Mr. Baskin's best friend.

From the foregoing it is clear that defendant entered the kitchen at the express invitation of Michele. His acceptance of this invitation was the natural thing for him to do. Thus he came into the home openly and by invitation and not secretly or surreptitiously. He was there to be seen by whoever might be present. He was then invited by Mrs. Bouchard into the living room. Again he accepted the invitation. Thus defendant was in the living room of the Baskin home not as a result of any planning of his own or any secrecy or concealment on his part, but by reason of invitations that had been extended to him by the members of the household and accepted by him. While in the home, defendant made no attempt to hide or conceal himself. When Baskin entered defendant did not spring upon him as from ambush, nor did he attempt to use his gun upon Baskin's entrance. After identifying himself he requested the members of the household to come into the living room and sit with Mr. Baskin on the couch to hear what he had to say to him. It was then that defendant explained his mission to Baskin. It was out of this factual picture that Baskin was killed.

From the foregoing it is apparent that there is no evidence to support the element of concealment, and therefore it was error to give the instruction on lying in wait.

██ Since we have concluded that the evidence is insufficient to justify the lying in wait instruction, the question then arises, Was it prejudicial? We are constrained to hold that the giving of this instruction was seriously prejudicial "since if the killing was committed by lying in wait, it was murder of the first degree by force of the statute (Pen. Code, § 189) and

the question of premeditation was not further involved [citations]." (*People* v. *Merkouris, supra,* p. 560.)

The situations which gave rise to the other questions argued by respective counsel in their briefs need not, and probably will not, arise in the course of a retrial. It therefore does not seem necessary to pass upon those questions.

The judgment is reversed.

Ashburn, J., and Herndon, J., concurred.