[Crim. No. 23406. First Dist., Div. Two. Nov. 19, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
MARK VENTERS McDERMAND, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

---

*Pursuant to rules 976 and 976.1, California Rules of Court, this opinion is certified for publication, with the exception of issues IV through VIII, and X and XI.

772

COUNSEL

Quin Denvir and Frank O. Bell, Jr., State Public Defenders, under appointment by the Court of Appeal, and Joel Kirshenbaum, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Robert R. Granucci and Blair W. Hoffman, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

ROUSE, J.—

### Statement of the Case

Defendant Mark McDermand was charged by information with two counts of murder, in violation of section 187 of the Penal Code.[1] The alleged murder victims were defendant's mother, Helen McDermand, and his brother, Edwin McDermand. Defendant was also charged with special circumstances justifying the imposition of the death penalty, in that he had committed two murders and had done so by means of lying in wait.

Defendant entered a plea of not guilty and denied the special circumstances. Following a trial by jury, he was found guilty of two counts of first degree murder, and the special circumstances were found to be true. Following the penalty phase of the trial, the jury found that the aggravating circumstances outweighed the mitigating circumstances and therefore imposed the death penalty.

Defendant subsequently moved for a new trial and for modification of the death penalty. The trial court denied the former motion but granted the latter, reducing defendant's sentence to life imprisonment without possibility of parole. Defendant filed a timely notice of appeal from the judgment of conviction.

### The Evidence

A. *The prosecution's case-in-chief.*

On the date of the murders, defendant Mark McDermand and his brother, Edwin, both resided with their mother, Helen McDermand, on Shoreline

---

[1]Unless otherwise specified, all statutory references herein are to the Penal Code.

Highway in Mill Valley. Helen was 75 years old, Edwin was 40 years old, and Mark was 35 years old. On the evening of Thursday, October 16, 1980, June Berry, who was a close friend of Helen McDermand and also a Mill Valley resident, became concerned because she had not heard from Helen that week. After calling the Marin County Sheriff's Department, Mrs. Berry drove to the McDermand home. She found that Helen's car was in the carport but that Mark's was not. Mrs. Berry knocked on the front door of the McDermand home and called Helen's name several times. When she received no response, Mrs. Berry returned to her home and made a second call to the Marin County Sheriff's Department, insisting that an officer be sent to check the McDermand home.

At approximately 8:30 p.m. on October 16, sheriff's deputies Cooper and Gulbrandsen drove to the McDermand residence in response to Mrs. Berry's call. Mrs. Berry was waiting for them and told them of her concern. After Deputy Cooper had repeatedly knocked on the front door and received no response, he telephoned Sergeant Miklos and indicated his intent to force entry into the McDermand home.

Sergeant Miklos arrived at the scene shortly after 9 p.m. and forced the front door open. The three officers entered and found the body of a man lying in a hallway off to the left of the living room. The body, subsequently identified as that of Edwin McDermand, was clad only in a pair of trousers and was lying partially in the hallway and partially in a bedroom which Edwin had occupied prior to his death. Deputy Cooper observed "post mortem lividity," which indicated to him that the victim had been dead approximately 12 hours. There appeared to be a number of bullet wounds in the victims' head and chest.

The sheriff's deputies then found that a second bedroom was locked, but they were able to gain access to this room after finding some keys lying on the living room floor. Upon entering this bedroom, the deputies found the body of an elderly woman, subsequently identified as Helen McDermand, lying on the bed covered by a blanket. The body had a single bullet wound behind the left ear and was stiff to the touch.

Later, the sheriff's deputies went outside the house and observed a small door, located near the carport, leading into the basement portion of the house. The door was padlocked shut from the outside, and there was no window or other means of access into the room. After forcing entry into this room, the deputies found a note tacked to the inner side of the door. The note was addressed to "Shitheels" and stated that by the time the note was discovered, the reader would be "*way* too late" and that the author

would be found on the news or on a "slab." The note was signed "Mr. Hate."

The basement room, later found to have been occupied by defendant Mark McDermand, contained a mattress and bedding on the floor. There were various items scattered about the room, including a large bowl of cigarette butts and a bag of dirty napkins, and the room had an unpleasant smell.

Search warrants were issued on October 17, 20, and 27, 1980, and the McDermand home was thoroughly searched. Eight spent .22 caliber casings were found on the floor: five near Edwin's body, one in the living room near the door to Helen's bedroom, one near a bookshelf between Edwin's and Helen's bedrooms and one in Edwin's bedroom. A wallet was found in the living room fireplace, along with a savings book and a bank statement in the name of Edwin McDermand. In defendant's basement bedroom, the sheriff's deputies found two boxes of .306 ammunition, two shotgun shells, nineteen spent .38 caliber casings, three live rounds of .22 caliber ammunition, gun cleaning equipment and two ankle holsters, one for a handgun and one for a knife.

Autopsies of the bodies of both victims were performed on October 17, 1980. The autopsy of Helen McDermand's body showed that death was caused by the single bullet wound behind her left ear. The presence of powder burns indicated to the coroner that the gun was several inches from her head when the fatal bullet was fired.

The autopsy of Edwin McDermand's body showed that the cause of his death was multiple bullet wounds to the head and chest. Edwin had been shot five times in the head. One of the bullets had entered his head behind his right ear and had lodged in bone at the base of his skull. The four other bullet wounds to Edwin's head were in the area of his right forehead and temple. There were three bullet wounds in Edwin's right chest. The coroner found no powder burns on Edwin's body.

The coroner testified that although it was impossible to determine the exact time of the death of either victim, samples of vitreous humor fluid taken from the victims' eyes at 3:30 and 3:46 a.m. on October 17 suggested that both deaths had occurred 65 to 95 hours earlier. In the coroner's opinion, Helen McDermand would have lost consciousness almost immediately upon being shot in the head, and death would have followed fairly rapidly. The coroner testified that any one of Edwin McDermand's bullet wounds could have been fatal and that it was impossible to determine the order in which the bullets had been fired. In the coroner's opinion, unconsciousness would have occurred very rapidly after Edwin had sustained any one of the

head wounds. However, it was possible that after the first shot to his head, Edwin's eyes could have remained open and he could have cried out and remained on his feet momentarily.

Within a few days after the discovery of the bodies, the local newspapers and the Marin County Sheriff and other members of his staff began receiving letters from an individual who claimed responsibility for the two murders. A handwriting expert testified that the author of these letters was the same individual who had written the note tacked to the inner side of the door to defendant's basement room, and defense counsel subsequently stipulated that the letters in question were written by defendant. One of the points which defendant repeatedly stressed in these letters was his intent not to be taken alive.

On October 23, 1980, Marin County Sheriff Howenstein met with a psychologist, Dr. Mathis, in an attempt to devise a plan by which defendant could be induced to surrender himself to the authorities without engaging in additional violence. Since defendant's letters indicated that he was following the newspaper coverage of the killings, it was decided that local newspapers furnished the best means of communicating with defendant and attempting to "defuse" him by persuading him that if he were to surrender, he would not be subjected to physical violence and would be treated fairly.

On October 24, 1980, in furtherance of this plan, Sheriff Howenstein ran an article in the San Francisco Examiner. It stated, inter alia, "We know that you're frightened, Mark, and we want to help. . . . We have what we think is a portrait of the scene at your family home and understand why it happened. We also know that you are the only one who can fill in the whole picture. [¶] . . . [T]his team of experts is very anxious to help you. They may have some answers to the questions that may be bothering you. We're also concerned about your health. We know that you have to maintain your insulin dosage. Please call me at 479-5736."

At 9 p.m. on October 24, the day that this article appeared in the Examiner, an individual who identified himself as defendant McDermand telephoned the number which had been given in the newspaper article. Captain Gaddini, who answered the telephone, testified that the caller not only gave his name as Mark McDermand but also furnished his driver's license number. Gaddini explained that he had previously received a letter from an individual claiming responsibility for the murders of Helen and Edwin McDermand and that the letter had given a driver's license number as the means by which the individual would identify himself in the future. After the caller had so identified himself over the telephone, he told Captain Gaddini that he was considering turning himself in, but that he had some things

which he needed to do first. He stated that he would call again at the same telephone number, possibly on Monday, October 27, sometime after 3 p.m.

Captain Gaddini testified that the individual in fact called twice on the evening of Sunday, October 26. Both calls were tape recorded and were played to the jury. During the course of the first call made on October 26, the caller described the murders in some detail. He stated that he had fired the first bullet into his mother's ear because "it's probably the quickest guaranteed kill in this existence . . . and I just didn't want her to have to see what I was going to be doing . . . or know it, even." With regard to the murder of his brother, the caller told Gaddini that he had fired the first bullet into the back of Edwin's head, intending for it to go under the lower edge of the cranium. However, the caller stated that the bullet struck bone instead and that Edwin remained conscious and turned around and looked at his assailant with an expression of horror and amazement. The caller told Gaddini that he then fired several additional shots, which he estimated at six, to stop Edwin from "being alive anymore . . . [c]ause he was hurting . . . and . . . killing's one thing, hurtin's another. And I don't want anybody to hurt."

Captain Gaddini received a third and final call at 3 p.m. on October 27. On this occasion, the caller stated that he was ready to turn himself in and would meet the sheriff's deputies at the International House of Pancakes in Vallejo at 4 p.m. that day.

Captain Gaddini and five other members of the sheriff's department drove to this prearranged meeting. They found defendant seated on the hood of his car, which was in the parking lot of the International House of Pancakes. Gaddini stopped his car some distance away, identified himself to defendant and told him to put his hands on the hood of his car. Defendant did so, and the deputies approached and placed him under arrest. Defendant was wearing a belt to which were attached a .38 caliber revolver and two speed loaders containing ammunition. His pockets contained another speed loader and a set of thumb cuffs.

Defendant was handcuffed and advised of his *Miranda* rights, which he waived. He signed a written consent to the search of his car and was then transported to the Marin County jail. On the way to the jail, defendant discussed the letters he had written to the press and to the sheriff's department, and he also stated that he had differing recollections of his crime, but remembered one version most strongly and believed it to be what had actually happened.

Defendant's car was searched, and it was found to contain a .22 caliber pistol, a .12 gauge shotgun, ammunition, a metal box which contained numerous hypodermic syringes, and some vials of insulin.

The prosecution also produced evidence intended to establish defendant's preexisting intent to kill his brother, Edwin. John French testified that he had known defendant for 17 years and Edwin for 14 years. When French first met Edwin in 1966, Edwin had just gotten out of the Army. French found him a quiet person who was very intelligent. However, according to French, Edwin began acting a little strange in 1968, and, in 1970, Edwin had himself committed to a mental institution in Mendocino County. When French saw Edwin following his release from this institution, French found that his condition had deteriorated markedly, and French explained that Edwin was always completely dirty and never bathed or brushed his teeth. Edwin's eating habits were also bizarre, and he would go to a restaurant and order four breakfasts at one time and drink every liquid listed on the menu. Edwin also had the habit of buying one of every type of newspaper on the stand, turning the pages very rapidly and then tossing the papers on the floor. French testified that Edwin was able to converse intelligently on a few subjects, such as history or astronomy, but that during conversations on other topics, Edwin would get up and pace about continuously, walking in and out of the room. Edwin also claimed over a period of years that he was writing a story, and he was continually scribbling notes on any piece of paper he could find. French described Edwin as the type of person who could "get on your nerves." He testified that defendant was at first sympathetic when his brother's condition deteriorated, but that defendant later became estranged from his brother and would sometimes refer to Edwin as "It" or "The Thing." On one or more occasions during the six-month period prior to the murders, defendant told French that "he didn't know what would become of his brother once the mother was gone, and that someday he would put 'It' out of its misery."

On cross-examination, French testified that he was aware that defendant had diabetes and that he (French) had seen defendant act a little drunk or wobbly when his insulin level was off balance. French stated that in the 17 years of his friendship with defendant, he had never known him to do a violent act. French also testified that whenever defendant made a derogatory reference to Edwin, he did so in a dejected tone of voice rather than a violent or angry one.

Kevin West, another friend of defendant, testified that approximately three months before the murders, defendant borrowed West's .12 gauge shotgun, stating that he needed it to protect his home. Subsequently, on approximately September 22, 1980, defendant borrowed a .22 caliber pistol from West. Defendant never returned either gun. West was shown the shotgun found in defendant's car, and he stated that it looked like his gun. Ballistics evidence also established that the .22 caliber pistol which defendant had borrowed from West was the gun which had fired two of the bullets

found in Edwin's body. The spent shell casings found on the floor of the McDermand home were also fired from this gun. The other bullets in Edwin's body and the single bullet in Helen McDermand's head were so badly damaged that it could not be ballistically proved whether or not they were fired from West's .22 caliber pistol.

A Mill Valley pharmacist testified that on October 1, 1980, defendant purchased 100 hypodermic syringes and then purchased another 100 on October 15. Since it was the pharmacist's experience that a person normally used only one syringe a day, he asked defendant why he needed the second box of 100 syringes. Defendant replied that he was leaving the state to help a friend open a restaurant and would be gone for from three to five months.

Larry Norris testified that on October 16, 1980, he was employed at Denny's restaurant in Corte Madera, where defendant was also employed on a part-time basis as a cook. Norris, who was the assistant manager of the restaurant, testified that on October 16, defendant insisted on being "cash-paid," contrary to Denny's policy, stating that he needed the money or he would have to leave town. Norris finally agreed and paid defendant approximately $50 on the afternoon of October 16.

Don Kerns testified that he was acquainted with defendant and had met him at Denny's restaurant in Corte Madera. Kerns stated that he encountered defendant at Denny's and conversed with him at some length on the morning of Sunday, October 12, 1980, and again on the afternoon of Monday, October 13. Kerns next met defendant at Denny's at approximately 1 a.m. on Tuesday, October 14. Kerns testified that he and defendant were part of a group at a particular table. Defendant had had some drinks and was acting more "loose" than he normally did. Defendant ultimately asked Kerns to sit with him at the end of the counter, where they could talk privately, and Kerns agreed. Kerns testified that his memory of the ensuing conversation with defendant was incomplete because "I did not want to hear it, and I blocked most of it." However, Kerns did recall pieces of the conversation, and he testified that defendant told him of signing "Mr. Hate" on the note he had left at the scene of the murders. Kerns also recalled defendant mentioning that the toes of one of the victims had curled. In addition, Kerns recalled defendant stating that the victims "had died as they had lived."

Kerns testified that he saw and talked with defendant on the evening of October 14 and again on the evening of October 15. Late on the morning of Thursday, October 16, Kerns and defendant briefly encountered each other at Denny's and agreed to meet on the morning of Friday, October 17, at the International House of Pancakes in El Cerrito. Kerns testified that

they met as arranged, had breakfast, and then went to a park in the Berkeley hills where they could talk privately and where they remained until late that afternoon. Kerns stated that during the course of the conversation in the park, he and defendant concluded that defendant had three options: "He had the option of suicide, he had the option of what I called, and we discussed, the shoot-out at OK Corral, allowing someone else to kill you as simultaneously you kill someone else, and the option of acquiring help; that is, help in a psychological sense." According to Kerns, he and defendant both agreed that the "system" did not furnish effective psychological help, and defendant also made it clear that he did not consider prison an acceptable option.

Thereafter, Kerns continued to meet defendant and talk with him, and on Sunday, October 19, defendant gave Kerns some letters and asked him to mail them. Kerns did so.

B. *The Defense.*

Defendant relied upon a diminished capacity defense, making no attempt to dispute the fact that he was responsible for the two killings. In defense counsel's opening statement, he informed the jury that the defense intended to prove that defendant, his brother and his mother, all suffered from schizophrenia.

The defense opened with a selected reading of excerpts from various writings by Edwin McDermand which were found in his room. The following passages are typical: "I, Edwin Nelson McDermand, read to the best of my memory on May 11, 1961, at about 11:00 p.m. Matthew 12, 43, 45 in the King James Bible, went partially mad. Read them correctly February 7, 1979, at about 10:50 p.m. correctly and entirely recovered." "To me in 1961, spirit was a trait. As used in the King James Bible, a spirit may be an entity. [¶] Doctors bled patients and thereby killed no few of them before the practice fell into disrepute. [¶] In the Second World War, the Navy used a torpedo that was supposed to work, in theory, to work but often didn't." "I consider the medical treatment I got in my agony to be on the order of that torpedo that sometimes worked and sometimes didn't." "Don't scream, Mr. President, while I hold this to your head. Scream and you die. Then die all the White House staff. Then dies the country. . . . At that, I would love to see the nations die, all of them. . . . For, you see, I was insulted. I allow none to do that. Not a species, not a race. [¶] What is the truth? When I read Matthew 12, 43, 45 the first time, I went partially insane. When I read them correctly the last time, I recovered insofar as is possible. This war is a tale. It shows how a misconception acquired by a man in his 20's can wreck much of his life. . . . [¶] Since there is not a word of truth in

Matthew 12, 43, 45, then literally, I am not mentally ill. There is no God. My mother is insane. What is the truth? What is the literal truth?"

Edna Litsinger, Helen McDermand's sister and defendant's and Edwin's aunt, testified that she was familiar with Edwin's mental problems and knew that he had consulted a psychiatrist in San Rafael in 1968 and had later had himself committed to a mental institution in Mendocino County. Mrs. Litsinger described Edwin as an individual who was "deeply, deeply preoccupied with his own concerns" to the extent that he appeared to be selfish and was very difficult to be with. She testified that the McDermand home "was too small for three strong people" and that she could feel the tension when Mrs. McDermand and her two sons were in the same room. Mrs. Litsinger stated that after a visit with Edwin, "I would be completely enervated and wonder how the other—the rest of the family could put up with it where I would have it just on a short occasion. But they lived with it."

Mrs. Litsinger also testified that defendant had built the basement room for himself and that she had suggested the idea and had purchased the lumber because she felt that he needed a little privacy. Mrs. Litsinger described defendant's various physical ailments, stating that he had suffered from seizures and blackouts when he was in his teens, that he had had severe headaches for years, that he had problems with his eyes, that he suffered from various side effects of diabetes and that he had continual pain in his legs, hands and arms as a result of arthritis. She also stated that during the six-month period preceding the killings, defendant seemed very unhappy and withdrawn and tended to become very irritated by his brother.

William Simmons, Jr., a psychiatric social worker, testified that he was employed in that capacity at Mendocino State Hospital in 1970 and 1971. Edwin McDermand was admitted to that hospital in December 1970, and Simmons worked with him for approximately nine months. Defendant was admitted to the hospital on April 28, 1971, and was discharged on January 21, 1972. Simmons did not work directly with defendant, but did have some contact with him.

Simmons testified that Edwin was suffering from very severe schizophrenia and that he had ongoing hallucinations concerning fecal matter even when heavily medicated with Thorazine and Stelazine. He also suffered from compulsions and rituals, and when Simmons walked about the grounds with him, Edwin insisted upon following certain specific pathways and walking around certain objects and under others. There were also certain objects in Simmons' office which Edwin was unable to touch or approach. Simmons stated that Edwin was continually in a state of extreme tension and that he often paced from one end of the corridor to the other. Simmons

testified that during the period when defendant was also being treated at Mendocino State Hospital, he and Edwin were in the same ward, and it was clear to Simmons that the two brothers cared about each other and that Edwin was at times quite dependent on defendant.

Simmons recalled being present on several occasions when Edwin received visits from his mother. According to Simmons, Edwin would focus his eyes on her face and would appear to be in a trance, with dilated pupils. Simmons testified that there are "schizophrenigenic" individuals who use words and suggestion in such a way as to cause symptoms of schizophrenia in others. Simmons was of the opinion that Helen McDermand possessed this quality at least to some degree.

John French, previously called as a prosecution witness, also testified for the defense. He described additional incidents of bizarre behavior on Edwin's part, such as the fact that he frequently made odd noises, consisting of sounds resembling a child chewing marbles, the blowing of air out of his mouth in a manner resembling a fish in a fishbowl, and a moaning noise which he made when he sat down or got up. French also testified that during the early stages of Edwin's mental illness, he would speak of his mother as a witch or sorceress. French recalled later incidents when Helen McDermand entered the room and Edwin covered his face with a newspaper or put a paper bag over his head in order to avoid looking at her.

Don Kerns was also recalled as a witness to give testimony for the defense. He stated that defendant was in considerable pain during the six months preceding the killings. He had problems walking, tending to hobble, and he also had trouble getting up after he had been seated for any length of time and showed pain in his facial expressions when he made various movements. On one occasion, less than two weeks before the killings, defendant was working at Denny's restaurant when he suddenly had to leave because he was temporarily unable to see. At approximately the same point in time, defendant appeared to be in a severe depression.

Defendant, testifying in his own behalf, corroborated the testimony of the other witnesses concerning Edwin's bizarre and unpleasant behavior. He also stated that there had always been tension in the McDermand home, even before defendant's and Edwin's father died in late 1966. Defendant described the tension as constant and stated that it was as though someone were always on the verge of losing their temper but never quite did. Defendant stated that during the weeks preceding the killings, he was suffering from various symptoms of diabetes, in that he was very tired, felt a loss of sensation in his hands and feet, "hurt very much," and was experiencing severe problems with his vision. Defendant testified that in the last few

months before the killings, he was heavily dependent on alcohol and con-sumed from a pint to a quart of vodka a day, depending on how much money he had. Defendant stated that he was "absolutely convinced" that he had shot his mother and brother, although he could not recall doing so. All that he could recall was returning home from Denny's sometime between mid-night and 1:30 a.m. and finding their bodies.

On cross-examination, defendant attempted to explain the incriminating statements which he had made during his telephone conversation with Cap-tain Gaddini on October 26, 1980. The essence of defendant's testimony was that although he could not recall the killings even at that time, he had reconstructed the scene in his mind based upon the information available to him. He testified that the only reason that he was able to tell Gaddini that the first shot in Edwin's head was meant to enter below the cranium was that he had seen Edwin's body and had noticed a wound that was so located. Defendant testified that he was able to describe Edwin's facial expression after he had first been shot because defendant knew that his brother always had a particular expression on his face whenever he was shocked or startled. Defendant claimed that all of his statements to Gaddini were based upon assumptions because "I don't know what happened." Defendant denied that he had plotted or planned to kill his brother, and he also denied that he had gone into the bathroom and waited for Edwin to come out of his room so that he could shoot him.

Dr. Cress, a psychiatrist, testified as an expert witness for the defense. Dr. Cress had reviewed various medical records pertaining to defendant and had interviewed defendant at the Marin County jail on three occasions. Among the medical records which Dr. Cress had reviewed were records from the Langley Porter Neuropsychiatric Institute where defendant was admitted in January 1965, following a suicide attempt at age 20. These records described defendant's mother as "highly anxious, neurotic, schiz-ophrenic," and his brother as "terribly compliant [and] withdrawn." De-fendant had been diagnosed as having encephalitis sometime between the ages of 7 and 10 and began having epileptic seizures at the age of 13. He was viewed by his family as suffering from some kind of a "brain weak-ness."

In Dr. Cress' opinion, the most significant pathological incident in de-fendant's life occurred when he was 15 years old. Dr. Cress considered this incident the "watershed" of defendant's whole development, personality and ability to relate with others. The incident in question occurred when two boys spray-painted on walls or fences in defendant's neighborhood the words "Mark is a queer." According to Dr. Cress, defendant found this a devastating experience, and he responded by threatening the two boys with

a shotgun. As a result, defendant was sent to juvenile hall where he was raped by other boys. Dr. Cress testified that this experience caused defendant to be almost completely alienated from other people from that time on. He was unable to complete more than one more year of high school and henceforth felt that he was an outsider and "the lowest of the low," viewing himself as both physically ill and morally and sexually defective.

Dr. Cress also considered defendant's severe diabetes a significant factor in his life. Dr. Cress testified that it contributed to defendant's belief that he had a sick, diseased body, and the doctor also stated that defendant occasionally experienced insulin shock which could have caused him to be confused, disoriented or even unconscious.

Dr. Cress testified that in the one or two-year period preceding the killings, defendant was experiencing constant physical and mental pain which he attempted to relieve with alcohol. Defendant was terrified by the thought of becoming a psychotic with delusions and hallucinations, as his brother had. In Dr. Cress' opinion, defendant believed in a "strange and bizarre way" that he could heal his own mind "if somehow or other his brother was out of the picture." Defendant saw his brother as the "sick side of himself" and also resented the closeness between his brother and his mother.

Dr. Cress was convinced that defendant had suffered periodic lapses of consciousness over the years, caused by epileptic tendencies exaggerated by alcohol and insulin abuse. Dr. Cress found evidence of mental illness in the flamboyant behavior demonstrated by defendant's letters to the sheriff's office and to the press. Cress also testified that defendant's emotions were inappropriate to his ideas, in that defendant felt that killing someone might be philosophically justified, but that hurting someone was absolutely wrong. Dr. Cress was of the opinion that defendant also confused facts with fantasy and had difficulty separating the two.

In conclusion, Dr. Cress diagnosed defendant as suffering from a paranoid personality disorder accompanied by depression, suicidal ideas and psychosomatic disorders or distortions. In Dr. Cress' opinion, defendant's paranoia included morbid jealousy over his mother and brother. Although Dr. Cress considered defendant a very intelligent individual, Cress believed that defendant's mental illness impaired his ability to deliberate in the sense that he was unable to objectively consider the consequences of killing his mother and brother and was incapable of a cold and calculated decision to kill them.

On cross-examination, Dr. Cress was questioned concerning certain medical records which indicated that as early as age 20, defendant was diag-

nosed as developing in the direction of a sociopathic character disorder. Dr. Cress defined such a disorder as involving the repetitive commission of crimes but expressed the view that such a diagnosis was questionable and inconsistent with other medical records diagnosing defendant as having schizophrenic, rather than sociopathic, tendencies.

## C. *Rebuttal Testimony.*

The prosecution produced rebuttal testimony that defendant had committed a number of thefts.

Williams Simmons, Jr., the psychiatric social worker who had testified as part of the prosecution's case in chief, was recalled as a rebuttal witness. He testified that defendant was voluntarily admitted to Mendocino State Hospital in February 1971 after he had stolen a gun and some money. Defendant was diagnosed at that time as having a personality disorder, which Simmons described as a distortion of normal personality rather than a "major psychiatric illness." However, Simmons was of the opinion that defendant did suffer from psychosis and was a "latent-type" schizophrenic who "periodically explodes." Simmons also testified that during defendant's stay at Mendocino State Hospital, he was manipulative of staff and behaved in a sullen and withdrawn manner which Simmons thought was designed to avoid punishment for the thefts committed before he entered the hospital.

Dr. Jeffress, a psychiatrist called as a rebuttal witness, based her testimony entirely upon various written material, including medical reports and trial testimony, since the defense had obtained an order which precluded her from personally interviewing defendant. She found no evidence that defendant was suffering from psychosis, and she testified that, in her opinion, defendant did not suffer from diminished capacity at the time of the killings and was fully capable of harboring malice and of deliberating and premeditating.

## I.

Defendant's first contention on appeal is that the evidence was legally insufficient to support a finding that he killed either victim by means of lying in wait. Defendant concludes that it was therefore error for the trial court to instruct the jurors that they could base a first degree murder conviction on that theory. Defendant acknowledges that the jury was also instructed on the prosecution's alternative theory that the murders were in the first degree because they were deliberated and premeditated. However, defendant asserts that the jurors clearly based the first degree murder convic-

tions on a lying in wait theory because they requested a rereading of the instructions on lying in wait and ultimately found true the special circumstances allegations that both murders were committed by lying in wait. Defendant concludes that both first degree murder convictions must be reversed and that his sentence to life without possibility of parole must also be vacated.

■ Defendant correctly points out that in order to justify a verdict of murder by lying in wait, the prosecution must not only show the elements of waiting, watching and concealment, but must also show that the defendant performed these acts in order to take his victim unawares and thereby facilitate his attack on the victim. (*People* v. *Mattison* (1971) 4 Cal.3d 177, 183 [93 Cal.Rptr. 185, 481 P.2d 193].) ■ Defendant contends that such proof was lacking in this case, which he likens to *People* v. *Kahn* (1961) 198 Cal.App.2d 326 [17 Cal.Rptr. 193, 89 A.L.R.2d 1135], and *People* v. *Thomas* (1945) 25 Cal.2d 880 [156 P.2d 7], two cases in which the evidence was held legally insufficient to establish murder by lying in wait. However, we find both cases readily distinguishable.

In *People* v. *Kahn, supra,* 198 Cal.App.2d 326, the victim broke off his engagement to the defendant's sister, Sophia, causing her severe humiliation and also causing the defendant's mother to suffer a nervous breakdown. (P. 327.) The defendant later went to the victim's home, identified himself to the victim's housekeeper and her daughter as a good friend of the victim and was invited to wait in the living room for the return of the victim, who was out playing golf. (P. 328.) When the victim returned, the defendant identified himself as Sophia's brother and asked the housekeeper and her daughter to join him and the victim in the living room to hear what he had to say. (P. 328.) When they had done so, the defendant pointed a gun at the victim and demanded that he pay $20,000 in order that Sophia could take a trip around the world to forget her broken heart. (P. 328.) The victim indicated that he did not have the money at that time, and the two men then began whirling and pushing each other until the defendant fired a single shot, killing the victim. (Pp. 328-329.) In reversing the defendant's conviction of first degree murder, the appellate court quite understandably held that the trial court had committed prejudicial error in instructing on lying in wait because there was no evidence of any secrecy or concealment on the defendant's part. (Pp. 330-332.)

*People* v. *Thomas, supra,* 25 Cal.2d 880, is likewise very dissimilar from this case. There, the defendant left the home where he lived with the victim, Bernice, and her mother, for the apparent purpose of going to his nighttime job at a shipyard. (P. 886.) However, he returned to the house shortly thereafter, either because he had missed his bus or because he was suspicious of

Bernice's fidelity and wanted to check on her. (Pp. 886-887.) Upon returning, the defendant did not immediately enter the house, but stood outside and eavesdropped on a conversation between Bernice and her mother concerning Bernice's desire to go out that evening. (P. 886.) The defendant then entered the house, where he seized Bernice and began struggling with her and then with her mother as well. (P. 887.) The defendant ultimately pushed Bernice out the front door. (P. 887.) The struggle continued until Bernice was thrown from the porch, attempted to flee and was shot and killed by the defendant. (Pp. 887-888.) Following his arrest, the defendant stated that he shot Bernice because she had been running around and that he had stayed home and "laid in wait" to catch her at it. (Pp. 888-889.) The Supreme Court held that despite this admission by the defendant, all of the evidence in the case established that the killing was not in fact a lying-in-wait or ambush murder. (Pp. 890-891.)

It is evident that no other conclusion could have been reached in either *People* v. *Kahn, supra,* or *People* v. *Thomas, supra,* since the evidence in both cases conclusively established that each defendant simply walked up and confronted the victim with no attempt whatever to facilitate his attack by taking his victim unawares.

We are likewise of the opinion that defendant's reliance upon *Richards* v. *Superior Court* (1983) 146 Cal.App.3d 306 [194 Cal.Rptr. 120], is misplaced. In that case, the appellate court held that the evidence produced at the preliminary hearing was insufficient as a matter of law to support a special circumstances allegation of lying in wait because the evidence showed only that the defendant and his accomplice had accompanied the victim to the latter's shop and then struck him a lethal blow to the head. (Pp. 311-316.) Since there was no testimony as to the precise manner in which the fatal blow was struck (p. 314), it would have been speculation, at best, to assume that the killing was accompanied by means of lying in wait.

The evidence in this case cannot be so characterized. Helen McDermand's body was found lying on her bed beneath a blanket with a single bullet wound behind her left ear, thus suggesting that defendant waited until she was asleep in order to take her totally unawares. Defendant's tape-recorded statement to Captain Gaddini also supports this scenario, since he stated that he fired the first bullet into his mother's ear in order to achieve a quick guaranteed kill and to prevent her from seeing or knowing what he was going to do. Defendant also told Gaddini that the first shot which he fired at Edwin entered the back of his head. Since Edwin's body was found lying partially in his bedroom and partially in the hallway and was clad only in a pair of trousers, the obvious conclusion is that defendant, well knowing that

Edwin would emerge from his bedroom when he heard the fatal shot which defendant had fired at Helen McDermand, so positioned himself as to take Edwin unawares and from behind when Edwin came out of his bedroom after having hastily put on his trousers. Thus, we find no factual resemblance between this case and the authorities cited by defendant, no error in the giving of instructions on murder by lying in wait, and ample evidence to support the jury's determination that both murders were committed by means of lying in wait.

## II.

Defendant next contends that the trial court committed prejudicial error when it ruled, over a defense objection, that the prosecutor could defer his cross-examination of defendant until after the defense psychiatrist, Dr. Cress, had completed his testimony.

The facts relevant to this ruling are as follows: The prosecutor moved for an order compelling defendant to submit to an examination by a court-appointed psychiatrist who could testify for the prosecution. However, when defense counsel opposed the motion, relying upon defendant's privilege against self-incrimination, the trial court denied the motion.

Subsequently, after defendant had completed his direct testimony and before the defense had called its expert witness, Dr. Cress, the prosecutor moved, outside the presence of the jury, that he be allowed to defer his cross-examination of defendant until after Dr. Cress had testified. In support of this motion, the prosecutor pointed out that the prosecution's expert witness, Dr. Jeffress, would not have the opportunity to interview defendant. The prosecutor further stated that he had not yet had the time to discuss defendant's direct testimony with Dr. Jeffress at any length and that before he cross-examined defendant, he would like to have the opportunity to discuss with Dr. Jeffress not only her impressions of defendant's direct testimony but her impressions of Dr. Cress' psychiatric testimony concerning defendant.

Defense counsel promptly objected, claiming that he had had no prior notice that any such motion would be made and further asserting that he found it an extraordinary idea that the prosecutor would be allowed to dictate to him the order in which he called the witnesses for the defense. Defense counsel also pointed out that since defendant had concluded his direct testimony that morning and the court had just reconvened following a noon recess of approximately an hour and a half, the prosecutor could have used that recess to confer with Dr. Jeffress on her impressions of defendant's direct testimony.

Nevertheless, the trial court ruled that it would grant the prosecutor's motion and allow him to defer his cross-examination of defendant until after Dr. Cress had testified. The court stated that it was basing its ruling on the fact that the prosecution was always at a considerable disadvantage in meeting a diminished capacity defense, which "all resides in the mind of the defendant and his psychiatrist," and that granting the prosecutor's motion would "give the prosecution a better chance to cross-examine with the aid [*sic*] of meeting a diminished capacity defense." Since Dr. Cress had not been told to appear as a witness until the next day, the court ordered the trial recessed until the following morning.

When court reconvened the following morning, further argument was held outside the presence of the jury. Defense counsel then raised a variety of additional arguments in an attempt to persuade the trial court to reconsider its ruling on the prosecutor's motion: (1) section 772 of the Evidence Code contained a mandatory requirement that all phases of a particular witness' testimony be concluded without interruption by the taking of other testimony; (2) the court's ruling requiring that Dr. Cress testify before defendant was cross-examined deprived defendant of the option of completing his testimony (including direct, cross, redirect and recross-examination) and only then deciding not to call Dr. Cress at all if his testimony were deemed unnecessary or potentially damaging to the defense; (3) the scope of the prosecutor's cross-examination of defendant might be unduly broadened by information elicited by the prosecutor during his cross-examination of Dr. Cress; (4) compelling Dr. Cress to testify before defendant had been cross-examined would deprive Dr. Cress of the opportunity to corroborate his views on defendant's mental condition by analyzing his reactions during cross-examination; and (5) the court's ruling had vitiated the knowing and voluntary nature of defendant's prior decision to testify, since that decision had been made without any forewarning of the fact that his direct and cross-examination would be bifurcated while Dr. Cress testified.

In response to these arguments, the prosecutor asserted that defendant had completely waived the privilege against self-incrimination once he took the witness stand. The prosecutor also denied that Dr. Cress would be deprived of the opportunity to testify concerning defendant's reactions during cross-examination, and he suggested that the court could permit Dr. Cress to give surrebuttal testimony on that subject. As for defense counsel's claim that the scope of cross-examination would be unduly broadened, the prosecutor took the position that the trial court would properly confine the scope of cross-examination to the subjects covered on direct examination regardless of the point in time when cross-examination occurred. Finally, the prosecutor denied that section 772 of the Evidence Code imposed any mandatory requirement that all phases of a particular witness' testimony be completed

without interruption, and he argued that the order of the presentation of the evidence was a matter within the trial court's discretion.

The trial court declined to alter its ruling that the prosecutor could defer his cross-examination of defendant until after Dr. Cress had testified. However, the court did later make it clear, after Dr. Cress had concluded his testimony, that he was to remain in the courtroom to hear defendant's cross-examination and was thereafter to make himself available to testify on that subject in the event that defense counsel chose to recall him for that purpose. The trial court also made it clear that the prosecutor's cross-examination of defendant would be limited to the subjects covered during direct examination.

On appeal, defendant reiterates the various arguments made by defense counsel in the trial court, and takes the position that the trial court's ruling that the prosecutor could defer his cross-examination of defendant until after Dr. Cress had testified violated defendant's federal and state constitutional rights, in that it deprived him of the effective assistance of counsel and violated his privilege against self-incrimination. Defendant places his primary reliance upon two cases, *People* v. *Collie* (1981) 30 Cal.3d 43 [177 Cal.Rptr. 458, 634 P.2d 534, 23 A.L.R. 4th 776], and *Brooks* v. *Tennessee* (1972) 406 U.S. 605 [32 L.Ed.2d 358, 92 S.Ct. 1891].

In *People* v. *Collie, supra,* 30 Cal.3d 43, the California Supreme Court held that the trial court had erred in granting the prosecutor's motion, made during the trial testimony of a particular defense witness, to discover the notes of a defense investigator who had interviewed the witness prior to the trial. (Pp. 49-56.) The court based this holding on its conclusion that the Legislature, and not the courts, should establish guidelines for prosecutorial discovery of defense material. (Pp. 54-56.) The court also expressed "grave doubts that a valid discovery rule affecting criminal defendants can be devised." (P. 56.)

In *Brooks* v. *Tennessee, supra,* 406 U.S. 605, the United States Supreme Court declared unconstitutional a Tennessee statute which provided that a criminal defendant who wished to testify in his own behalf was required to do so before any other defense witness testified. (Pp. 611-613 [32 L.Ed.2d at pp. 363-364].) The Supreme Court recognized that the statute in question reflected a legitimate state interest in sequestering prospective witnesses in order to prevent them from tailoring their testimony to conform to that of the witnesses who preceded them. (Pp. 607, 611 [32 L.Ed.2d at pp. 361, 363].) Thus, the defendant himself, who is entitled to be present at every phase of his trial, could only be effectively sequestered from the other defense witnesses if he were required to testify first. (P. 607 [32 L.Ed.2d at

p. 361].) However, the Supreme Court held that the defendant also had a compelling interest in being able to make an informed decision as to whether or not to testify and thereby risk cross-examination and impeachment by evidence of prior crimes, and that he could not make such an informed decision unless he could evaluate the other defense witnesses before deciding whether or not to testify. (Pp. 607-610 [32 L.Ed.2d at pp. 361-363].) The court concluded, therefore, that the Tennessee statute compelling a criminal defendant to testify first or not at all substantially impaired his privilege to remain silent and that the state interest underlying the statute was outweighed by the defendant's right to make a truly informed decision as to whether to remain silent. (Pp. 610-612 [32 L.Ed.2d at pp. 362-363].) The court further held that the statute in question violated the defendant's due process rights, since it deprived him of the proper assistance of his trial counsel by compelling counsel to elect whether the defendant should testify or not before he had had the opportunity to evaluate the testimony of the other defense witnesses. (Pp. 612-613 [32 L.Ed.2d at pp. 363-364].) The court concluded that the trial court had violated the defendant's constitutional rights by denying him the opportunity to testify because he had declined to do so before the other defense witnesses. (P. 613 [32 L.Ed.2d at p. 364].) The court further concluded that inasmuch as the state had made no claim that the error was harmless, the defendant was entitled to a new trial. (P. 613 [32 L.Ed.2d at p. 364].)

Defendant McDermand interprets *People* v. *Collie, supra,* 30 Cal.3d 43, as guaranteeing to a criminal defendant the absolute right not to expose any element of his defense to the prosecution until the particular point in time when he and his attorney chose to present evidence pertaining to that aspect of the defense. He contends that in this case, the trial court violated that right when it allowed the prosecutor to control the order in which the defense case was presented by deferring cross-examination of defendant until after the defense psychiatrist had testified. Defendant also asserts that the trial court's ruling violated the holding of *Brooks* v. *Tennessee, supra,* 406 U.S. 605, because it deprived defendant of the opportunity to make a truly informed choice as to whether to testify and because it also deprived him of representation by a trial counsel whose control over the case for the defense was complete and unfettered.

■ We have concluded that defendant is correct in characterizing the trial court's ruling as erroneous, although we cannot agree with his assertion that section 772 of the Evidence Code imposes any mandatory requirement that all the phases of a particular witness' testimony be concluded without interruption by the taking of other testimony. Section 772 provides, in pertinent part, only that "(a) The examination of a witness shall proceed in the following phases: direct examination, cross-examination, redirect exami-

nation, recross-examination . . . . (b) Unless for good cause the court otherwise directs, each phase of the examination of a witness must be concluded before the succeeding phase begins."

Contrary to the position taken by defendant, Evidence Code section 772 does not require that all phases of the examination of a witness be concluded without interruption. The statute provides only that each *phase* of a witness' testimony shall be completed before the next *phase* commences: i.e., direct examination must be completed before cross-examination commences. Obviously, there was no deviation from this procedure here, since defendant's direct examination was completed before he was cross-examined.

Instead, this case would appear to fall within the ambit of the general rule that the order of proof in a criminal case rests in the sound discretion of the trial court (Evid. Code, § 320; *People* v. *Cuevas* (1971) 16 Cal.App.3d 245, 250 [93 Cal.Rptr. 916]), including the postponement of cross-examination. (*People* v. *Johnson* (1968) 68 Cal.2d 646, 655 [68 Cal.Rptr. 599, 441 P.2d 111].) However, in our view, such discretion is not properly exercised where, as here, the trial court defers cross-examination of the defendant, over a defense objection, for the sole purpose of rendering the prosecutor's cross-examination more effective. We agree with defendant that such a ruling violates the underlying reasoning of *People* v. *Collie, supra,* 30 Cal.3d 43, and *Brooks* v. *Tennessee, supra,* 406 U.S. 605, by interfering with defense counsel's control over the presentation of his case and compelling the premature revelation of the precise nature of the defense. Nevertheless, we have concluded that, in this instance, defendant could not have been prejudiced by the trial court's erroneous ruling.

*People* v. *Collie, supra,* 30 Cal.3d 43, and *Brooks* v. *Tennessee, supra,* 406 U.S. 605, are both authority for the proposition that error of this nature is not necessarily prejudicial. In *Collie,* the court held that the error was in fact harmless (30 Cal.3d at pp. 60-61), and in *Brooks,* the court applied the harmless error test of *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065], and held the error prejudicial only because the state tacitly conceded the point. (406 U.S. at p. 613 [32 L.Ed.2d at p. 364].)

In this instance, we have already rejected the first ground of objection raised by defense counsel in the trial court: we found no mandatory requirement in section 772 of the Evidence Code that cross-examination immediately follow direct examination. Defense counsel's remaining grounds for objection all constituted attempts to establish the likelihood that defendant would be prejudiced by the postponement of his cross-examination, but we

have concluded that defendant made no such showing in the trial court and has failed to do so on appeal.

Thus, we find it unreasonable to assume, as defense counsel suggested, that the trial court's ruling prejudiced defendant because it prevented him from completing all the phases of his testimony before deciding whether or not to call Dr. Cress as a witness for the defense. The flaw in this argument is that it is not within the realm of reasonable possibilities that defense counsel would have elected, under any circumstances, not to call Dr. Cress. The very heart of the defense consisted of Dr. Cress' psychiatric testimony that defendant suffered from diminished capacity, and it seems inconceivable to us that any competent defense attorney would have chosen to base the defense solely upon the remaining defense testimony, which consisted of defendant's claim that he blacked out and testimony by various other witnesses that Edwin was a bizarre and unpleasant individual with severe mental problems.

Likewise, we find no merit to defense counsel's claim that the trial court's ruling deferring defendant's cross-examination until after Dr. Cress had testified would unduly broaden the scope of such cross-examination. As we have previously noted, the trial court quite properly confined the scope of defendant's cross-examination to subjects covered on direct examination.

Defense counsel's final claim of prejudice was that the trial court's ruling vitiated the voluntary and informed nature of his decision to testify, since he might have declined to testify had he known that the trial court would order his cross-examination deferred until after the completion of Dr. Cress' testimony. This argument rests on an unpersuasive analogy to the situation in *Brooks* v. *Tennessee, supra,* 406 U.S. 605. There, as previously noted, the court held that the defendant's right to remain silent could only be adequately protected if he were allowed to evaluate the testimony of the other defense witnesses before deciding whether or not to take the stand. However, the *Brooks* court expressly limited its holding by stating that "nothing we say here otherwise curtails in any way the ordinary power of a trial judge to set the order of proof . . . ." (P. 613 [32 L.Ed.2d at p. 364].) In this instance, defendant was never deprived of the opportunity to evaluate the testimony of the other defense witnesses before deciding whether to testify or remain silent. He had that option available to him, but defense counsel was obviously of the opinion that defendant should testify and that the most effective way to present the case for the defense was for defendant to present his version of the facts at an early stage in the defense case. In any event, defendant's claim that he might have chosen not to testify had he known in advance that the court would order his cross-examination deferred is based on the underlying assumption that this change in the order

of proof was prejudicial to him. However, we have already analyzed and rejected defendant's various specific claims of prejudice, and we also deem it appropriate to note at this point that there is California authority for the proposition that it is within the trial court's discretion to permit the prosecutor to recall a defendant for further cross-examination even after the defense has rested. (*People* v. *Rosoto* (1962) 58 Cal.2d 304, 352 [23 Cal.Rptr. 779, 373 P.2d 867]; *People* v. *La Vers* (1933) 130 Cal.App. 708, 713-714 [20 P.2d 967].) Such being the case, defendant could always have been subjected to *some* cross-examination after the prosecutor had had the benefit of hearing Dr. Cress' testimony; thus, defendant is complaining, in effect, of the fact that the court ordered that *all* of his cross-examination, rather than *some* of it, would take place after the completion of Dr. Cress' testimony. We fail to see how defendant was thereby prejudiced.

In conclusion, while we are of the opinion that the trial court should have denied the prosecutor's motion to defer his cross-examination of defendant, we are convinced that the error was harmless under either *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243], or *Chapman* v. *California, supra,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710].

III.

■   Defendant contends that the trial court erred in refusing to suppress evidence of his October 26 tape-recorded telephone conversation with Captain Gaddini wherein defendant admitted shooting his mother and brother. Defendant asserts that these incriminating admissions were tantamount to a confession and must be deemed involuntary as a matter of law because they were precipitated by deceptive representations by various members of the Marin County Sheriff's Department. Specifically, defendant claims that he made the telephone call to Captain Gaddini in reliance upon newspaper articles in which Sheriff Howenstein had offered defendant psychiatric help and had made the representation that he and his department did not want to punish defendant. Defendant further asserts that when he telephoned Captain Gaddini on October 26, Gaddini continued these " 'clever softening-up' " tactics by again offering to help defendant in addition to assuring him that his aunt still cared about him. Defendant takes the position that in view of the uncontradicted evidence of these promises and assurances by members of the sheriff's department, this court should hold that the prosecution failed as a matter of law to meet its burden of proof beyond a reasonable doubt that defendant's confession was voluntary. (See *People* v. *Jimenez* (1978) 21 Cal.3d 595, 608 [147 Cal.Rptr. 172, 580 P.2d 672].)

In addressing this argument we point out that defendant himself has narrowed the scope of his attack upon the tactics of the sheriff's department

by making certain significant concessions. Thus, defendant states that he is making no claim that Captain Gaddini was required to advise him of his *Miranda* rights (see *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) before questioning him over the telephone concerning the killings. Defendant also concedes that, if the representations and promises made by the sheriff's department were limited to effecting defendant's surrender, "there could have been absolutely no quarrel with such tactics. Indeed, the authorities were *obligated* to attempt to prevent further violence and to protect innocent citizens." However, defendant claims that the conduct of the sheriff's department was improper because it was designed to accomplish two separate results: inducing his surrender and persuading him to confess to the murders.

We cannot agree with defendant that the sheriff's department must be held to have gone beyond what was reasonably deemed necessary to effectuate defendant's peaceful surrender. As previously noted, defendant had repeatedly stressed in his letters to the sheriff's department and to the press, his intent not to be taken alive, and a threat of this nature, coming from someone who had just shot and killed two people, could not be taken lightly. Therefore, the sheriff's department consulted a psychologist, Dr. Mathis, in order to determine how best to induce defendant to surrender himself without injury to himself or others. At the hearing on defendant's motion to suppress evidence of his confession, Dr. Mathis testified that he met with Sheriff Howenstein and Undersheriff Ingerwersen after he had reviewed the various letters which defendant had written concerning the crimes. Howenstein and Ingerwersen asked Dr. Mathis his opinion as to the most effective way to persuade defendant to give himself up, and Mathis told them that he thought that defendant was under great emotional and physical stress and wanted to find a way to give himself up but was undecided as to what to do. Mathis stated that in his opinion there was a wide range of possibilities as to how defendant might behave: he might harm someone else, kill himself, or give himself up. Mathis told Howenstein and Ingerwersen that in his opinion, the best strategy for persuading defendant to surrender himself peacefully was to convince him, through the media, that the sheriff's department had people available to answer some of his questions, that he would not be able to rest until he had those answers and that the sheriff's department did not want to punish him.

It is evident that the sheriff's department followed these instructions to the letter and that they had precisely the desired effect. Defendant surrendered himself without resorting to any further violence. While it is true that Dr. Mathis' instructions did have the additional effect of producing a confession during defendant's telephone conversation with Captain Gaddini, we cannot agree with defendant that the sheriff's department deliberately sought

this result. In actual fact, it is highly likely that affording defendant the opportunity to confess was an essential element of any successful strategy for persuading him to surrender himself peacefully. Thus, it is evident from the various letters which defendant wrote to the press and the sheriff's department that he had an overwhelming need to talk about the killings. Apparently, Dr. Mathis was aware of this need and suggested, therefore, that defendant be told that experts would be available to answer his questions and discuss the killings with him.

In conclusion, we are of the opinion that there was ample evidentiary support for the trial court's implied finding that the sheriff's department did not act out of any improper intent to induce a confession but solely out of the intent, which defendant concedes to be not only proper but praiseworthy, of persuading defendant to surrender himself peacefully.

This case appears to fall with the purview of certain California cases which establish that, in an emergency situation, the police are justified in interrogating a suspect without complying with the normal rules designed to protect his constitutional right against self-incrimination. In *People* v. *Riddle* (1978) 83 Cal.App.3d 563, 574-575 [148 Cal.Rptr. 170], the appellate court held that exigent circumstances may excuse compliance with the *Miranda* rule in instances of overriding need to save human life or to rescue persons whose lives are in danger, and that admissions or confessions obtained during such rescue operations are not inadmissible. The court quoted the United States Supreme Court in *Mincey* v. *Arizona* (1978) 437 U.S. 385, 392 [57 L.Ed.2d 290, 300, 98 S.Ct. 2408]: "'"The need to protect or preserve life or avoid serious injury is justification for what would otherwise be illegal absent exigency or emergency.'"" (*Riddle,* at p. 572.) The *Riddle* court then laid down certain requirements for an emergency which it deemed sufficient to excuse noncompliance with *Miranda*: "1. Urgency of need in that no other course of action promises relief; [¶] 2. The possibility of saving human life by rescuing a person whose life is in danger; [¶] 3. Rescue as the primary purpose and motive of the interrogators." (P. 576.)

The rule of the *Riddle* case was later applied in *People* v. *Willis* (1980) 104 Cal.App.3d 433 [163 Cal.Rptr. 718, 9 A.L.R. 4th 578], where the police had resumed interrogation of the defendant, following the assertion of his *Miranda* rights, in the hope of obtaining information concerning a victim whom the police believed might be alive and in need of help. (P. 446.) The appellate court held that the facts "demonstrated a genuine emergency which justified renewed interrogation despite *Miranda*. It follows the admissions obtained from defendant thereby were not rendered inadmissible either by virtue of *Miranda* or other federal or state constitutional principles." (P. 449.) In the *Willis* case, the defendant contended that

the primary purpose of the police in interrogating him was not to save the life of the victim but to obtain incriminating statements from him and that the *Riddle* decision was distinguishable for that reason. The appellate court rejected this argument, stating, "As *Riddle* points out, however, an interrogation concerning 'rescue' might ordinarily have the dual purpose of both rescue and incrimination, but so long as the developed facts show the motive behind the interrogation to be *primarily* that of rescue, the interrogation is justifiable despite an apparent *Miranda* violation." (P. 449.) Under the reasoning of the *Riddle* and *Willis* cases, it is clear that, even if it could be said that the Marin County Sheriff's Department was motivated both by the desire to induce defendant's peaceful surrender and the desire to obtain incriminating admissions from him, nevertheless, the existence of an emergency situation justified the conduct of the sheriff's department and rendered defendant's confession admissible.

IV.*

. . . . . . . . . . . . . . . . . . . . . .

IX.

Defendant attacks the sufficiency of the evidence to support the jury's special circumstances findings that both murders were committed by means of lying in wait. Defendant relies upon the rule that the corpus delicti of a criminal offense must be established independent of the extrajudicial admissions of the defendant, and he asserts that this rule should be held applicable to special circumstances findings. Based upon this premise, defendant goes on to argue that the prosecution relied exclusively upon his incriminating admissions in support of the lying-in-wait allegations.

This argument is untenable for two reasons. First, the California Supreme Court held in *People* v. *Cantrell* (1973) 8 Cal.3d 672, 680-681 [105 Cal.Rptr. 792, 504 P.2d 1256],[6] that although the corpus delicti of the crime of murder must be established by evidence independent of the extrajudicial statements of the defendant, such statements may constitute the sole evidentiary basis for determining the *degree* of the murder. Thus, the defendant in *Cantrell* was charged with first degree murder, based upon the theory that the murder occurred during the commission of the felony of child mo-

---

*See footnote, *ante*, page 770.

[6]*People* v. *Cantrell* was disapproved on other grounds in *People* v. *Wetmore* (1978) 22 Cal.3d 318, page 324, footnote 5, page 327, footnote 7 [149 Cal.Rptr. 265, 583 P.2d 1308].

lesting. (P. 677.) On appeal from his conviction, the defendant contended that the prosecution was required to establish the corpus delicti of both the crime of murder and the crime of child molesting independent of his extrajudicial admissions. (P. 680.) The Supreme Court did not agree and held that once the corpus delicti of murder had been established (in that instance, by circumstantial evidence), it was entirely proper for the prosecution to rely upon the defendant's extrajudicial admissions to prove the "circumstances surrounding the crime" and the fact that the defendant was sexually molesting the victim immediately before he strangled him and was therefore guilty of first degree murder. (Pp. 680-681.)

We can find no logical basis for holding, as defendant suggests, that although a defendant's extrajudicial statements are competent proof of the *degree* of a murder, they may not be used to support a charge of special circumstances.

Nor is our conclusion in this regard altered by the California Supreme Court's recent decision in *People* v. *Mattson* (1984) 37 Cal.3d 85 [207 Cal.Rptr. 278, 688 P.2d 887].) In that case, the defendant was convicted of two murders, and the jury also found to be true certain *felony-based* special circumstance allegations to the effect that the murders were committed during the commission or attempted commission of rape, lewd and lascivious conduct on a child under 14 years of age, and kidnaping. (P. 88.) The defendant contended on appeal that the rule of *People* v. *Cantrell, supra,* 8 Cal.3d 672, had been rendered inapplicable by section 190.4, subdivision (a), which specifically provided that " '[w]herever a special circumstance requires proof of the commission or attempted commission of a crime, such crime shall be charged and proved *pursuant to the general law* applying to the trial and conviction of the crime.' " (*Mattson,* at p. 93.) In *Mattson,* the defendant argued that the phrase "general law" incorporated the corpus delicti rule generally applicable to the proof of any felony offense and that the Legislature had thereby made the *Cantrell* rule inapplicable to the proof of felony-based special circumstances. (P. 93.) The Supreme Court agreed, holding that it was required to construe "the somewhat ambiguous language" of section 190.4 in the light most favorable to the defendant. (Pp. 93-94.) However, the Supreme Court did not disapprove of its prior decision in *Cantrell* nor did it hold the reasoning of that case inapplicable to special circumstance allegations which were other than felony-based. (P. 94.) Therefore, we are of the opinion that the *Cantrell* decision is still controlling in a situation where, as here, the defendant is charged with a special circumstance, such as lying in wait, which is not felony-based.

Moreover, as we have previously pointed out, there *was* evidence, independent of defendant's extrajudicial admissions, to support the jury's special

circumstance findings that the murders were committed by means of lying in wait. (See pp. 787-788, *ante.*)

X.*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

The judgment is affirmed.

Kline, P. J., and Smith, J., concurred.

A petition for a rehearing was denied December 18, 1984, and appellant's petition for a hearing by the Supreme Court was denied February 14, 1985.

*See footnote, *ante*, page 770.